# Exhibit A-

Case No. 14CV-001274: December 20, 2017 Plaintiffs' Memorandum Contra to Defendant Aleksandre Dgebuadze's Motion to Vacate Default Judgment

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

Ruth Hunter, et al.,                      :
                                          :
            Plaintiffs,                   :          Case No: 14CV-001274
                                          :
vs.                                       :          Judge Colleen O'Donnell
                                          :
Rhino Shield, et al.,                     :
                                          :
            Defendants.                   :

### MEMORANDUM CONTRA DEFENDANT ALEKSANDRE DGEBUADZE'S MOTION TO VACATE DEFAULT JUDGMENT

Defendant Aleksandre Dgebuadze moves for relief from a default judgment filed on November 10, 2015. Mr. Dgebuadze failed to file an Answer or otherwise respond in accordance with the civil rules, despite admittedly being properly served with the summons and Complaint well over three years ago on September 22, 2014.

Mr. Dgebuadze's motion asserts three bases for relief. First he asserts that plaintiffs "failed to effect proper service." Next, he asserts that he was not given notice by the plaintiffs of the motion for default judgment. Finally, he says that he is entitled to relief under Civ. R. 60(B)(5) due to "misrepresentations by Defendants and their counsel" (defendants Jim Williams, Tri-State, and their lawyer David Lackey) that have nothing to do with the plaintiffs.

Plaintiffs respectfully submit that there is no merit to this motion, and no viable grounds exist for relief from the judgment under any part of Civ. R. 60(B). Plaintiffs respectfully request leave to supplement this response once discovery requests on the issues and matters germane to this motion are answered in full. Written document requests were served upon Mr. Williams, Tri-State, and their lawyer David Lackey, and Aleksandre Dgebuadze, and a request for their depositions was made, on December 18, 2017.



EXHIBIT
A

0D947 - K37

**A.      Service Was Perfected Upon Mr. Dgebuadze on September 22, 2014.**

Mr. Dgebuadze's assertion that there is a lack of "proper service" is contradicted both by the record and Mr. Dgebuadze's affidavit, at ¶8, in which he confirms that he was properly served by certified mail on September 22, 2014. For some reason, Mr. Dgebuadze contacted defendant Jim Williams following service, but did not file an Answer or otherwise respond to the lawsuit as required by the civil rules. His affidavit further acknowledges, at ¶9, that he properly received and signed for the summons and Complaint on "September 22, 2016 (sic)" at his residence. His argument that there was improper service is belied by his own affidavit and provides no basis for relief from the judgment. Accordingly, this motion should be denied for this reason.

He also waived any argument about the service issue by failing to respond. "Ohio's Rules of Civil Procedure provide that a defendant may serve an answer within 28 days after service of the summons and complaint upon him, Civ. R. 12(A)(1), or may choose to present certain defenses by way of motion. Civ. R. 12(B)(6). Where a defendant elects to defend by way of motion, the service of the motion alters the period of time for filing an answer. If the trial court denies the motion, the defendant's responsive pleading, i.e., its answer, must be filed within 14 days after notice of the court's action. Civ. R. 12(A)(2)(a)." *PSE Credit Union, Inc. v. Wells*, 2016-Ohio-7780, at ¶10.

Once served, a defendant has only two options to respond by filing either an Answer or a Civ. R. 12(B) motion, and must do so within 28 days of service. "[A] Civ. R. 12(B)(6) motion to dismiss is an alternative to answering the complaint. Cromartie v. Goolsby, 8th Dist. Cuyahoga

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274

0D947 - K38

No. 93438, 2010-Ohio-2604, ¶14.  Thus, a defendant has 28 days after service of the summons

and complaint to file either an answer or a Civ. R. 12(B)(6) motion to dismiss." *Id.* at ¶11.

Any challenge to the propriety of service had to be timely made.  Mr. Dgebuadze never

filed anything nor did he respond once he was admittedly served.  *See also*, Civ. R.

12(H)(1)(b)("A defense of lack of jurisdiction over the person * * * is waived * * * if it is neither

made by motion under this rule nor included in a responsive pleading or an amendment thereof

permitted by Rule 15(A) to be made as a matter of course."

His motion makes reference to a third amended complaint being filed September 7, 2016,

but the record reflects that no such amended complaint was filed that day.  Even if it had been

filed that day, Mr. Dgebuadze was still in default by almost two years as to the amended

complaint and summons served upon him on September 22, 2014 and he already had waived the

defense.  As the second motion for default judgment filed March 11, 2015 clearly states, Mr.

Dgebuadze was long in default for failing to respond to the First Amended Complaint which was

served upon him on September 22, 2014.  Accordingly, his argument that service was improper

because he was not served with a fictitious "third amended complaint" on September 7, 2016 has

no merit whatsoever.

**B.      Mr. Dgebuadze Was Not Entitled to Notice Because He Failed to Respond in Compliance with the Civil Rules and Never Made an Appearance.**

Mr. Dgebuadze argues that plaintiffs failed to provide notice "of their default judgment

filing," but he was not entitled to any notice from the plaintiffs because he admittedly never

answered or made an appearance on the record which might arguably entitle him to notice.  Civ.

R. 55(A) only requires notice where a party has made an appearance.  Since he admits that he

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 5 of 35 PAGEID #: 180
Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K39

never made an appearance, and failed to respond to the Complaint or summons, he was not entitled to notice from the plaintiffs. *See, Mckean v. Howell*, 2003-Ohio-353, at ¶11 ("Our review of the record indicates appellant made no appearance in this case until after the entry of default judgment. Accordingly, he was not entitled to notice of the default hearing pursuant to Civ. R. 55."); *Lewis v. Connors*, 2003-Ohio-632, at ¶12 ("The record demonstrates that Connors 'failed to plead or otherwise defend' in the action and, thus, he was not entitled to notice. See AMCA Intern. Corp. v. Carlton (1984), 10 Ohio St.3d 88; Ohio Valley Radiology Associates, Inc. v. Ohio Valley Hosp. Assn. (1986), 28 Ohio St.3d 118. Because Connors entered no appearance of any kind in the present case after being duly served with the summons and complaint in accordance with the civil rules, he was not entitled to notice of the default proceedings. Sexton v. Sugar Creek Packing Co. (1974), 37 Ohio St.2d 58, 59.").

His motion seems to suggest, without more, that he made an "appearance" by contacting "Defendant Williams." Motion to vacate, p. 9. This again is not an appearance as to the case, nor is there any indication that the plaintiffs were aware of this in the first place. To the extent that he might suggest that this is the "appearance" on which he relies, it has no bearing on his default as to the plaintiffs.

Thus there is no issue regarding notice, and the motion should be denied for this reason as well.

**C.      Mr. Dgebuadze is Not Entitled to Relief under Civ. R. 60(B)(5).**

The motion seeks relief under Civ. R. 60(B)(5) and acknowledges the need to show that the motion is timely, that there is a meritorious defense supported by operative facts, and that the

4

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 6 of 35 PAGEID #: 181
Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K40

judgment is somehow unjust. Mr. Dgebuadze meets none of the criteria necessary for relief under this section.

"An order may be vacated under Civ. R. 60(B)(5) for 'any other reason justifying relief from the judgment.' It is known as the catch-all provision, and it is only used in extraordinary and unusual cases when the interest of justice necessitates it. Caruso-Ciresi, Inc. v. Lohman, 5 Ohio St.3d 64 (1983), paragraph one of the syllabus. Civ. R. 60(B)(5) is applicable only where a more specific provision does not apply. Strack v. Pelton, 70 Ohio St.3d 172, 174 (1994). It may not be used as a substitute when a request for relief under Civ.R. 60(B)(1)-(3) is untimely. Caruso-Ciresi at 66." *Archer v. Dunton*, 2017-Ohio-8846, at ¶10. *See also, Adomeit v. Baltimore*, 39 Ohio App. 2d 97, 105 ("Civil Rule 60(B)(5) is only to be used in an extraordinary and unusual case when the interests of justice warrants it."); *Wiltz v. Accountancy Board of Ohio*, 2016-Ohio-8345, at ¶40 ("Courts only invoke Civ. R. 60(B)(5) in those extraordinary and unusual cases where the moving party demonstrates substantial grounds warranting relief from judgment. Id., citing Caruso-Ciresi at paragraph two of the syllabus; Soc. Psychological Servs., Inc. v. Magellan Behavioral Health, Inc., 10th Dist. No. 10AP-326, 2010-Ohio-6531, ¶17.").

This is by no means an extraordinary or unusual case as it concerns his request for relief from the judgment. Accordingly, Civ. R. 60(B)(5) does not apply, nor does it afford any relief under the circumstances.

First, the motion was been filed over three years *after* Mr. Dgebuadze was served. This alone is well beyond a reasonable time. His motion makes no effort to explain, let alone justify, why he waited over three years to file the motion, nor does he cite any case law justifying such a long period of time to wait to file the motion. He apparently got no reports or communications

5

0D947 - K41

regarding his alleged representation which might arguably support his position that waiting over three years is somehow reasonable. The lengthy delay shows the exact opposite, that he ignored the case.

The failure to timely file this motion is fatal, especially where, as here, there is no justification or explanation for waiting over three years to file this motion. "A motion to vacate a default judgment, which is filed nearly seven months after actual notice of the action and more than four months after default judgment was entered, does not, on its face, satisfy the reasonable time requirement; in the absence of any evidence explaining the delay, the movant has failed to demonstrate the timeliness of the motion. Mt. Olive Baptist Church v. Pipkins Paints & Home Improvement Ctr, Inc. (1979), 64 Ohio App.2d 285, paragraph two of the syllabus; Angel v. Angel (Feb. 18, 1993), 4th Dist. No. 92CA2071. In other words, an unexplained or unjustified delay in making the motion after discovering a ground for relief may put the motion beyond the pale of a reasonable time. Minnis, citing 2 Browne, Klein & Murtaugh, Baldwin's Ohio Civil Practice (1988) 118, T. 53.05; Fouts v. Weiss-Carson (1991), 77 Ohio App.3d 563, 567; Sec. Fed. S. & L. Assn. of Cleveland v. Keyes (June 29, 1990), 11th Dist. No. 89-G-1524 (trial court's granting of a Civ. R. 60(B) motion held to be an abuse of discretion where appellee failed to offer any explanation for an 18-week delay in filing his motion to vacate the default judgment rendered against him)." *Herlihy Moving and Storage, Inc. v. Nickison*, 2010-Ohio-6525, at ¶15.

Failing to allege and support a viable defense also necessarily dooms the motion. "We conclude that appellant did not sufficiently allege and support that he had a viable defense, and

6

that, therefore, the first prong of GTE has not been met." ***Central Ohio Sheet Metal, Inc. v. Walker***, 2004-Ohio-2816, at ¶12.

Likewise, the failure to cite or provide any basis warranting relief under Civ. R. 60(B) is fatal to the motion. "The second prong of GTE requires that the movant demonstrate that he was entitled to relief under one of the provisions of Civ. R. 60(B)(1) through (5). Although appellant filed a Civ. R. 60(B) motion, the motion does not discuss any grounds for relief from judgment as stated in Civ. R. 60(B)(1) through (5). Appellant having failed to do so, the trial court did not err in denying appellant's motion to vacate. As such, appellant's first assignment of error lacks merit, is not well-taken and is overruled." ***Id.*** at ¶13. Other than general arguments, Mr. Dgebuadze's motion also fails to establish any basis under Civ. R. 60(B) which might otherwise entitle him to relief.

Mr. Dgebuadze also seems to blame Messrs. Williams and Lackey for his failure to respond, but this is not clear from the motion. He has also not requested or sought a hearing on his motion to vacate. Even if he had, the request would fail as courts frown upon parties blaming their lawyers as a basis to set aside judgments. Mr. Dgebuadze places all blame for his failure to respond to this lawsuit upon Messrs. Williams and Lackey, presumably to show excusable neglect on his part, but he otherwise fails to allege any operative facts necessary to warrant relief. "Appellants' attempt to excuse their own neglect by placing the blame on their Nevada attorney is inconsistent with the concept of 'excusable neglect' under Civ. R. 60(B). As a general rule, the misconduct of an attorney is imputed to the party who retained the attorney. Swan v. Swan, 10th Dist. No. 04AP-1089, 2005-Ohio-4636. In Swan, this court explained the rule of imputed misconduct in the context of excusable neglect under Civ. R. 60(B)(1) as follows:

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 9 of 35 PAGEID #: 184
Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K43

'Because parties to civil actions voluntarily chose their own attorneys, they cannot avoid the consequences of the acts or omissions of their freely-selected representative. [GTE Automatic Elec, Inc.] at 152, quoting Link v. Wabash R.R. Co. (1962), 370 U.S. 626, 633-634, 82 S. Ct. 1386, 8 L.Ed.2d 734. 'Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer/agent * * * .' Id. If an attorney's representation falls substantially below what is reasonable under the circumstances, the client's remedy is against that attorney in a suit for malpractice. Id., quoting Link, supra, at 634, fn.10. Any other remedy would amount to 'visiting the sins' of the attorney of the moving party upon the innocent party.' Id. at ¶10."

*Nick v. Cooper*, 2016-Ohio-5678, at ¶24.

Mr. Dgebuadze also seems to argue that his ignorance of his case somehow allows him relief. He seems to suggest that he was entitled to rely on the notion that he was represented for three and a half years by attorney Lackey, even though he apparently never had any communication or report or notice regarding the case. His failure to pay any attention to his case is inexcusable, and offers no basis to set aside the judgment. "[A]ppellants have provided no explanation for their own failure to contact the court regarding the status of their case or to check the docket to determine whether any action was required in the six-month period in which they were unrepresented. In the context of relief from judgment, '[a] party involved in litigation cannot simply sit back and claim ignorance of the proceedings.' Northup at ¶22 ('[A]lthough appellant claims that he was unaware of the status of his case or of his attorney's failure to respond to appellee's summary judgment motion, he also had a duty to keep himself informed of the status of the case. His ignorance * * * does not demonstrate excusable neglect.'). Rather, 'a party to an action must keep himself informed of the status of the case.' Id., citing State Farm Mut. Auto. Ins. Co. v. Peller, 63 Ohio App. 3d 357, 361 (8th Dist.1989). Here, appellants completely disregarded their duty to keep themselves informed of the status of this action after attorney Lindsmith withdrew. It is certainly reasonable to infer from appellants' affidavits that

8

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 10 of 35 PAGEID #: 185
Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K44

appellants did not intend to take any action with respect to this litigation other than continuing to contact attorney Hone regarding insurance coverage. Such inaction is inexcusable. See Wells Fargo Bank v. Grutsch, 5th Dist. No. 14 CAE 100067, 2015-Ohio-4721 (appellants did not establish that their failure to oppose summary judgment was the result of excusable neglect even though it was shown that the motion was not served to counsel's correct mailing address where the record showed that appellants were personally aware of the motion prior to the trial court's ruling)." *Id.* at ¶26.

He also makes no effort to set forth the requisite excusable neglect, a necessary and key element to relief from the judgment. The failure to do so also dooms his motion. "'Allowing a defendant to file an answer out of rule without moving for leave to file and showing excusable neglect under Civ. R. 6(B) is an abuse of discretion.' See Hillman at ¶8, citing Miller v. Lint, 62 Ohio St.2d 209, 214, 404 N.E.2d 752 (1980) and Davis v. Immediate Med. Servs., Inc., 80 Ohio St.3d 10, 14-15, 684 N.E.2d 292 (1997). 'Though a court may endeavor to quickly reach the merits of a controversy, the integrity of procedural rules is dependent upon consistent enforcement because the only fair and reasonable alternative thereto is complete abandonment.' Id." *Howard v. Hawkins*, 2017-Ohio-1473, at ¶34.

Mr. Dgebuadze also wrote in a separate motion that he "has elucidated both the misrepresentations by Defendants and their counsel," as a basis for continuing the damages hearing, but that has nothing to do with whether the plaintiffs were entitled to default judgment or a damages hearing. He also continues to mistakenly argue that the burden is on the plaintiffs to set forth "any operative claims or allegations" against him, when the standard to be met on a Civ. R. 60(B) motion includes the burden on *him* to allege *operative facts* supporting a

9

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K45

meritorious defense as part of the grounds necessary for relief under Civ. R. 60(B). These arguments fail to provide any basis for relief from judgment.

Mr. Dgebuadze's motion to vacate mistakes the burden of alleging operative facts. He utterly fails to allege any operative facts justifying either the motion or a meritorious defense. This also necessarily means that this motion must be denied. "Although a movant is not required to support the motion with evidentiary materials, the movant must do more than make bare allegations that he or she is entitled to relief. Kay v. Marc Glassman, Inc. (1996), 76 Ohio St.3d 18, 20, 665 N.E.2d 1102, citing Rose Chevrolet, Inc. v. Adams (1988), 36 Ohio St.3d 17, 20, 520 N.E.2d 564. The movant must allege operative facts 'with enough specificity to allow the trial court to decide whether he or she has met that test.' American Express Travel Related Servs. v. Carleton, 10th Dist. No. 02AP-1400, 2003-Ohio-5950, ¶9. In our view, appellee wholly failed to meet this requirement. Appellant's motion for relief from judgment made no mention whatsoever of any specific facts which would constitute a meritorious defense to the complaint, other than the generalized statement that appellant suffered soft tissue injury. This does not rise to the degree of specificity required to demonstrate the existence of a meritorious defense, for purposes of Civ. R. 60(B)." *Emery v. Smith*, 2005-Ohio-5526, at ¶34.

Mr. Dgebuadze contends that he has retained counsel but that does not obviate the fact that he has been in default for well over three years, having admittedly been served on September 22, 2014, and never doing anything until less than a month before the damages hearing. His failure to do anything for such a long time bars his motion to vacate.

10

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 12 of 35 PAGEID #: 187
Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Dec 20 9:13 PM-14CV001274
0D947 - K46

Accordingly, the plaintiffs respectfully submit that this motion should be denied. The plaintiffs respectfully request that they be granted leave to supplement this response with additional evidence once limited discovery currently underway is completed as to this motion.

Respectfully submitted,

*/s/ James P. Connors*
James P. Connors, Esq. (0034651)
**LAW OFFICES OF JAMES P. CONNORS**
580 South High Street, Suite 150
Columbus, OH 43215
(614) 221-6868
FAX (614) 221-6889
JClaw221@aol.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing was served upon counsel for the defendants via ECF, this 20th day of December, 2017.

*/s/ James P. Connors*
*Counsel for Plaintiffs*

11

# Exhibit B-

## Case No. 14CV-001274: Plaintiffs' July 07, 2016 Third Amended Complaint

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 14 of 35 PAGEID #: 189
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E19

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

Ruth A. Hunter, et al.,                :
                                       :
              Plaintiffs,              :        Case No. 14CV-001274
                                       :
vs.                                    :        Judge Colleen O'Donnell
                                       :
Rhino Shield, et al.,                  :
                                       :
              Defendants.              :

## AMENDED COMPLAINT
### (Jury Demand Endorsed Hereon)

Plaintiffs Ruth and David Hunter, for their Amended Complaint (pursuant to the court's

order filed June 22, 2016), against defendants Rhino Shield, James H. Williams, Rudolph J.

Pallone, Aleksandre Dgebuadze, Tri-State Coating, Inc., Tri-State Coatings and Repair LLC,

Cleveland Coatings, Inc., John D. Robertson, Rhino Shield Florida, Timeless Coatings LLC, and

AmCoat Industries, Inc., state the following:

I.     **Nature of the Action.**

1.     This case arises from an agreement for home exterior painting and repair services

which the defendants, collectively and individually known as "Rhino Shield," verbally offered

and agreed to perform for David Hunter on November 14 and December 31, 2012 at his home.

The claims set forth below are being asserted against the defendants both collectively and

individually.

2.     In late 2012, David Hunter, a retired tradesman in poor health, was hoping to

address home repair and maintenance issues which he could no longer handle by himself. David

hoped to resolve these issues due to his declining health so that his wife Ruth would not have to

worry about them should something happen to him. Ruth Hunter was aware of her husband



EXHIBIT
B

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 15 of 35  PAGEID #: 190
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E20

David's concerns, but was not involved with the agreement or any arrangements for services between her husband and the defendants.  Ruth Hunter was not involved with and did not sign the agreement, nor did any of the defendants sign the agreement presented to David Hunter by Rudy Pallone on December 31, 2012.

**II.      Jurisdiction, Venue and the Parties.**

2.      Plaintiffs have resided at the above address at all times material to these claims.

3.      Defendants are collectively and individually known as "Rhino Shield" in one form or another, and are believed to be a loosely organized group of foreign and domestic corporations, limited liability companies, and/or individuals based in Indiana, Kentucky, Florida, Michigan, or perhaps some other state.

4.      "Rhino Shield" conducts business with unsuspecting consumers across the country without indication of its true or accurate corporate or company status, nor without properly registering, as it concerns Ohio, with the Ohio Secretary of State or being properly licensed to legally conduct business in Ohio and elsewhere.

5.      The company known as "Rhino Shield" originated and was founded in Brighton, Michigan at some point in the early to mid 2000's.  The company founders are believed to comprise a few individuals who eventually moved the company to Florida, where it is now believed to be based.

6.      Timeless Coatings is believed to be a Michigan company under which Rhino Shield once conducted business prior to ceasing to conduct business under this name, and moving to Florida.  At some point, perhaps late 2012, that entity dissolved and its owners moved to Florida to continue the business.  Cleveland Coatings is believed to be another version of

2

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 16 of 35 PAGEID #: 191
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E21

Timeless Coatings which James H. Williams recently formed on January 23, 2014 in Ohio and purports to use the Rhino Shield name.

7.    "Rhino Shield" is now believed to also be known as AmCoat Industries Inc. and/or Rhino Shield Florida. Rhino Shield Florida and AmCoat Industries Inc. are licensed to conduct business in Michigan. They are not licensed to conduct business in Ohio.

8.    Rhino Shield conducts business nationwide through an extensive mass marketing strategy involving mass media marketing with an 800 number, local media advertising, and internet advertising and websites. It conducts business under varying Rhino Shield names in many different states. None of these entities discloses the true parent or affiliate company which owns either the name or coating product known as "Rhino Shield."

9.    As a result of this case, Rhino Shield has recently removed information about its company history, product specifications, coating product mil thickness, and installer/employee certification and training from its dozens of websites including, specifically, information about its origination in Michigan and its re-location to Florida. It has removed information about the mil thickness of its ceramic coating in light of its history of failing to meet its published standards of mil thickness for the coating. It has withdrawn information purporting to certify its employees and others who perform its services and apply its coating.

10.    Rhino Shield has also reformed information about how it conducts business, now claiming to be a nationwide network of "distributors." It also now implies that it does not actually perform the services which it advertises and sells to consumers, contrary to its standard business practice of selling services to consumers and then outsourcing the actual work to unqualified persons, some of whom are either lacking any experience or are convicted felons.

3

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 17 of 35  PAGEID #: 192
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E22

11.    Rhino Shield has also withdrawn published information about its workers who perform the services as being certified and trained.  It now represents that product application and related services may be done through "painters" and others.  It has historically, though, held itself out as Rhino Shield when contracting with consumers but actually had the services performed and product application done by subcontractors or others without advising its customers that it would not perform the services themselves.

12.    Defendant Tri-State Coatings and Repair LLC dba Tri-State Coatings is believed to be an Ohio limited liability company which is an agent of Rhino Shield and/or which conducts business as Rhino Shield in Ohio.  It is also believed to be related somehow to the amorphous "Rhino Shield" and another company based in Indiana known as "Tri-State Coating, Inc."

13.    Defendant Tri-State Coating, Inc. is an Indiana corporation which conducts business in, among other states, Indiana, Kentucky, and Ohio.  At all times material to this case, it was not properly licensed to conduct business in Ohio and was not properly registered with the Secretary of State to conduct business in Ohio.  It is also believed to conduct business as "Rhino Shield."

14.    Defendant Cleveland Coatings, Inc. is believed to be an Ohio corporation formed on November 20, 2013.  On January 23, 2014, Cleveland Coatings, Inc., by and through Jim Williams, for the first time filed a trade name registration with the Ohio Secretary of State purporting to conduct business under the name "Rhino Shield."  Jim Williams is listed on the purported trade name registration as "president" of the company and submitted the corporate formation documents on behalf of Cleveland Coatings, Inc. under his signature.

15.    John D. Robertson is an individual who is believed to reside in Marion, Ohio or thereabouts who conducts business for Rhino Shield and the other defendants as their agent

4

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 18 of 35  PAGEID #: 193
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E23

and/or sub-contractor. Rudy Pallone likewise holds himself out as an employee or agent of Rhino Shield. All defendants including Mr. Robertson conduct business throughout Ohio including Franklin County, Ohio.

16. Aleksandre Dgebuadze is a contractor who was apparently retained to provide services for Rhino Shield on the Hunters' home. A copy of the alleged agreement under which he provided services to Rhino Shield is attached as Exhibit A to the Third Party Complaint filed by Tri-State on March 11, 2014 in this action. Aleksandre Dgebuadze is believed to be one of the contractors primarily responsible for the services provided to the Hunters under the agreement with what they were led to believe was Rhino Shield.

17. This court has both personal and subject matter jurisdiction over the parties and venue is proper pursuant to Civ. R. 3(B).

**III. Facts Common to All Claims.**

18. Ruth and David Hunter, an older couple in their late 60s, have lived in their current home since it was built in 1995. In 2012, due to his declining health, David wanted to have their home repaired, painted and updated. David hoped to have a reliable contractor examine and power wash their home, paint most of the exterior as well as the house trim and other areas as needed, caulk and seal cracks in the stucco exterior, repair and replace deteriorating wood as needed, and paint their home's exterior wood and stucco areas.

19. At some point in late 2012, Mr. Hunter saw a television advertisement for "Rhino Shield" offering these and other services which they needed for their home. In response to the ad, Mr. Hunter called 1-800-RHINO41 as directed by the television advertisement. Shortly thereafter, Rhino Shield sent a sales representative to meet with Mr. Hunter.

0D132 - E24

20.     Rhino Shield offers what it considers to be a unique ceramic coating which it claims is permanent and has tremendous benefits over traditional paint including that its product is 8-10 times thicker in terms of mils when dried as opposed to traditional paint.

21.     Since this lawsuit was filed, Rhino Shield has now changed its advertising to include, among other changes, a dramatic reduction in the advertised mil thickness of its product versus paint. Defendants now claim that the coating product mil thickness is 8-9 mils versus what paint would cover at 1-1.5 mils. This is a deep reduction from what they advertised in early 2014 and earlier when they advertised and promoted their coating as being up to 20-24 mils thick versus paint which was 2-2.5 mils according to their prior advertisements and websites before this case was filed.

22.     The Rhino Shield coating applied to the Hunters' home was in several instances zero mils thick or, more commonly, anywhere between 1 or 2 mils to 6 mils, which is well below what they advertised and told Mr. Hunter at the time. The coating is intermittently either thin or non-existent, and in no instance did it meet what they told the Hunters it would be.

23.     Rhino Shield advertises its ceramic coating as having the following benefits, among others:

"There are many benefits of choosing Rhino Shield's ceramic coating for your home or business exterior over traditional house paint.

Rhino Shield's ceramic microsphere coating provides:

Secure Waterproofing

High Specification Insulation

Unique Soundproofing Qualities

Class A Smoke and Fire Rated

6

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 20 of 35 PAGEID #: 195
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E25

Windproofing

Salt Tolerance

Protection Against Mildew, Fungi and Algae

No Cracking, Peeling, Flaking or Blistering"

24.     Rhino Shield further advertises as follows that its coating is not "paint," is much

better than "paint," and provides permanent protection for a house:

"Rhino Shield's new slogan is "It's Not Paint."  And a big reason why that's true is the microspheres
in Rhino Shield's coating.
Microsphere's are "small spherical particles, with diameters in the micrometer range" according to
Wikipedia.  They give Rhino Shield some of it's best qualities.  A 3M industry expert wrote in an
article for Paint and Coatings Magazine in 2003 that "Thermal and acoustic insulation properties of
coatings or substrates can be improved by the addition of microspheres.  Makers of roof coatings,
fire-retardant materials and sensitive acoustic equipment currently use this property."  The details of
how microspheres work so well in exterior paint coatings be read in this article titled The Benefits of
Microspheres.
Rhino Shield brings together the beauty of house paint on your home exterior with long-lasting paint
qualities, and microspheres are a big reason."

25.     Rhino Shield also promotes its company and product as superior to paint for a

home exterior such that it is "maintenance free for at least 25 years":

"Rhino Products, LP has established itself as a specialist in the sale and application of Rhino
Shield™ ceramic coating products for both residential and commercial clients.

Because of our direct relationship with the manufacturer, we offer you the combined advantages of
dealing with a local, family owned company while benefiting from the technical expertise and
resources of a highly respected national manufacturing company.
Our professional ceramic coating applicators, field consultants, and supervisors take great pride in
each project. From start to finish we go to great lengths to insure the project proceeds smoothly and
efficiently. Our goal is to make sure that each of our clients is totally satisfied with our service, feel
that they have received more value than they anticipated, and are eager to recommend us to family
and friends. Our mission is to insure that once their project is completed, our client will not have to
address exterior maintenance issues for at least another 25 years.
We welcome inquiries and will endeavor to respond in a prompt and courteous manner. We look
forward to serving you."

26.     Rhino Shield does not stop there in promoting and advertising its coating system

to consumers such as the Hunters.  Its website states, in part:

"If you're looking for a permanent, long-lasting exterior paint, choose Rhino Shield's Ceramic
Paint Coating and Never Paint Again!  Rhino Shield looks like paint but lasts like vinyl.

7

0D132 - E26

Rhino Shield offers you the "Ultimate Paint Job" and is the leader in home and office building exterior coating technology.

Only Rhino Shield offers all these benefits:

- Won't Chip, Flake, Crack or Peel
- Thicker & Richer than Paint
- Thousands of Color Choices
- Bonds to Wood, Brick, Stucco, Aluminum, Vinyl, Block and Steel
- Waterproof & Breathable
- Resists Mold and Mildew
- Ceramics-Low "E" Rating
- Class "A" Fire Rating...it Won't Burn
- 25 Year Non Prorated Transferable Warranty
- BASF Tested & Proven to Last

**Rhino Shield is the best long-term answer if you want the look house painters and commercial painters offer and the longevity you get from vinyl siding. It's like permanent, long-lasting paint, but it's not paint... it's much more! No other painting contractor in Indiana, Ohio or Kentucky offers Rhino Shield and all the incredible ceramic paint coating benefits.**

**Our products speak for themselves. Call us today for a no-obligation, in-home consultation at 888.744.6441 or request an estimate online."**

27.    Rhino Shield promotes and offers consumers a "lifetime warranty guarantee," claims it has "superior customer service," and has "the highest level of exterior preparation in the country insuring our unique proprietary product to exceed expectations." In light of these and other extraordinary assurances and promises of superior products and customer service, David Hunter decided to contact and eventually hire Rhino Shield to perform their home painting and repair work needed for their home.

28.    In response to Mr. Hunter's call, Rhino Shield sent a sales representative named "Rudy Pallone" to the Hunters' home. At the home, Rudy even provided them with a business card featuring the name "Rhino Shield" on the back side along with statements "Ultimate Paint Job" and at the bottom, "Never Paint Your House Again!" Rudy promoted the ceramic coating product and "sold" it to Mr. Hunter along with the other services needed by the Hunters for their

home. The Hunters assumed that based on the representations made to them by phone as well as by Rudy when he visited their home that they were dealing at all times with a company known as "Rhino Shield" which they further assumed was properly and legally permitted to conduct business in Ohio, and that its services and products were superior as advertised and stated by Rudy.

29. On November 14, 2012, the defendants provided Mr. Hunter with a "takeoff quote" for their services to be performed on the Hunters' home. A true and accurate copy is attached hereto as Exhibit A.

30. Mr. Hunter did not immediately sign an agreement or hire Rhino Shield. When the defendants later tried to secure his business, Mr. Pallone told Mr. Hunter that there would be a price increase in 2013. Mr. Pallone then presented Mr. Hunter with a written contract on behalf of defendants to lock in a price for their services to avoid the alleged increase. On December 31, 2012, Mr. Hunter signed the contract for the services which Mr. Pallone or "Rhino Shield" again told him that they would perform to his satisfaction. A true and accurate copy of the contract is attached hereto as Exhibit B. The agreement was not signed by anyone, including any defendant, other than Mr. Hunter.

31. Rudy assured Mr. Hunter about the superiority of their ceramic coating product in lieu of paint that they could apply to the house. He was impressed and felt good about the proposal, so he gave Rudy a $1,200 deposit and signed the contract. In May, 2013, the Hunters paid another $9,817 to the defendants.

32. Rhino Shield was supposed to start the job in early spring, but canceled three times before finally starting on or about May 6, 2013. The job did not go well from the start.

0D132 - E28

33.     On May 3, 2013, Rhino Shield, or what the Hunters assumed was Rhino Shield, came to their home to power wash the house before coating it. When they failed to start work soon after arriving, Mr. Hunters asked why. The workers responded that they did not have gas for the power washer. Because they had previously twice changed and delayed the coating date, Mr. Hunter offered to give them the gas so they could get started.

34.     On May 4, 2012, John Robertson appeared at the house with two unidentified men to begin work. At some point later into the project, the Hunters learned that the workers were actually sub-contractors and not Rhino Shield employees. The contract did not indicate, nor were the Hunters ever told, that Rhino Shield would use sub-contractors or anyone other than their own employees to do the job. It is still unclear to this day who actually performed the services and work on the Hunters' home. All they knew was that they were told that the company was Rhino Shield and that was the company performing the services, when those representations were not true.

35.     A man believed to be the owner of the sub-contractor, John D. Robertson, told the Hunters that one of his men had been imprisoned three times for selling drugs. Mr. Hunter was so concerned that he asked "Rudy" if he did background checks. Rudy would not answer the question.

36.     On May 4, 2013, Mr. Robertson came to prepare for the coating. They taped around the windows and doors until running out of tape and paper. This in turn caused them to have to later on paint areas which were not properly taped and covered. Every place they failed to properly cover is still covered in paint. They repeatedly promised to fix this, but never did.

37.     The defendants were supposed to replace any bad or damaged wood. They only replaced two pieces of wood. Later, the Hunters found other wood in various places in the house

10

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 24 of 35 PAGEID #: 199
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E29

that was rotten and over which the defendants had just painted rather than repairing or replacing as agreed and promised.

38. The defendants were supposed to caulk and seal all cracks in the stucco on the house exterior. When applying the sealant, they made straight lines on the stucco. The Hunters asked whether they would make the sealant have a similar appearance to the stucco. The defendants responded that it would be "okay" and that the dissimilar appearance would not show once it was coated. The defendants were wrong because the sealant did not properly or adequately cover the stucco or have the same appearance as the stucco.

39. The defendants also failed to repair all the cracks and failed to inspect the stucco top to bottom before they started coating. They also did not remove the down spouts before applying the coating. Instead, they placed cardboard behind the down spouts which resulted in some of the coating getting on the brick on the side of the house. Likewise, they failed to cover the roof, so they got coating all over the edges of the roof.

40. When the defendants got to the higher elevantions of the house exterior, they said they could not proceed and needed to stop working because their ladders were not long or tall enough. The Hunters were discouraged by the lack of progress on their job, and wanted it completed, so they let them use their ladders. The Hunters were astonished that a painting company did not have ladders capable of reaching the top of their house!

41. The defendants were also not very good at applying the coating. They did even worse work when they got near the top part of the house. When they attempted to apply coating near the top part of the house, they also coated the security lights which should have been covered before applying the coating. This in turn created another mess when the coating got on

11

areas where it should not have been applied, and was also over-sprayed. The Hunters were forced to buy new security lights to replace those covered by the coating.

42.     When they coated the back of the house, they failed to cover the windows and doors. In turn, this caused the coating application to miss the area and hit the windows and doors. The defendants continued to misapply the coating, over spray, and fail to properly apply the coating on areas where they could reach.

43.     The defendants also cut a pine tree away from the back porch rather than cover it before applying the coating. They also killed Mrs. Hunter's plants by tamping them down. The Hunters were very discouraged.

44.     The Hunters addressed their concerns with Rudy Pallone, who then told them that everything would be fixed and cleaned up. That never happened. The coating was also not applied at the proper mil thickness and continues to peel, split, crack, blister, and break. The job was a disaster. The Hunters asked them to repair the damage and finish the job. The defendants agreed and repeatedly assured them that they would complete the job and repair the damage.

45.     On June 7, 2013 the Hunters had another meeting with Rudy in which they expressed their concerns, issues, deficiencies, and problems with the job, and presented him with a written report of the problems. They discussed the many areas which needed to be finished, cleaned and repaired, and fixed per the supposed warranty. Rudy said that he didn't have the authority to pay for the roof and that "only Jim Williams could do that." Otherwise, Rudy said that they would repair all the damage and complete the job to the Hunters' satisfaction.

46.     On June 12, 2013, Jim Williams sent an apology letter to the Hunters. In the letter, Mr. Williams (who apparently works for Tri-State Coating, Inc.) wrote that the job would be completed as early as June 14, 2013. He also agreed that they would work to resolve the

12

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 26 of 35 PAGEID #: 201
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E31

"punch list" provided by the Hunters and that they would be satisfied with the work. None of

that ever happened. The letter follows in its complete form:



47.    On June 13, 2013, Rudy Pallone sent an email in which he wrote that the reason

he did not refer to the items he agreed needed to be completed and repaired was because they

were included in the punch list provided by the Hunters.

48.    On June 14, 2013, Jim Williams sent an email in which he committed to a follow

up meeting on June 15 to address the issues from the June 7 meeting at the Hunters' home. On

June 17, it was agreed to move that meeting to June 19 due to thunder storms.

49.    On June 19, 2013, Jim Williams came to the Hunters' home with Rudy Pallone

and inspected the job and walked around the house with the Hunters. During the inspection, the

Hunters expressed their dissatisfaction with the job. Mr. Williams found even more problems

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 27 of 35  PAGEID #: 202
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
OD132 - E32

that needed to be fixed and repaired, and agreed with the Hunters regarding the problems with the work on their house.

50.     Mr. Williams assured the Hunters and said that he would "take care of everything" and that he would immediately send "two crews" out the next day to fix "everything." The "two crews" consisted of two men who stayed three hours. When they left, the Hunters were unable to find a single repair done by them.

51.     Williams and Pallone also committed at the June 19 meeting to personally supervise the job completion and necessary repairs. They committed to make things right, no matter what it took. The Hunters were so upset with the process that they had their son Mark step in to assist them with the problems and act as the point of contact. Williams and Pallone agreed to use Mark as their contact with his parents.

52.     During the June 19 meeting, Mr. Williams made the following comments as it concerned what he saw and found upon inspection of the job and property on June 19, 2013:

•" I'm not happy; I don't condone the condition this home is in; Uh it's missing product in places you got color on color." "It's not, It's not..I'm angry."
* "I'm angry; I'm beside myself"
* "It is never the problem, it is how it is handled."
* "If I could speak freely Alex and I are going to correct what's not right."
* "He [Alex] has actually shown me some areas that are not on the list. Which is encouraging to me. He said he's got some areas that he needs to back roll into the stucco."
* "Why were we not here quicker? If you see a peel, call."
* "I'm going to stand here today, this house will be right when I leave."

53.     Nothing happened after the June 19 meeting as far as Williams or Pallone's promises were concerned. The Hunters then unexpectedly received a letter dated June 27 sent under Jim Williams' signature in which the defendants were apparently signing off of the job without conducting the promised repairs and without completing the job as agreed and promised. None of the defendants bothered to explain this to the Hunters, they all just left without

14

0D132 - E33

completing the job or repairing the damage to the Hunters' home. A true and accurate copy of

the letter is below:



June 27, 2013

Mr. David Hunter
12890 Woodtown Rd.
Galena, OH 43021

Dear Mr. Hunter,

As we have completed the installation of Rhino Shield Ceramic Coating on
your home, we would like to thank you again for your business. We are
confident that you will be happy with your decision for years to come. I have
enclosed your warranty, so please put it in a safe place for future transfers.

In addition, we have added a customer survey in an effort to continuously
improve our company and it's processes. Please take a moment of your time to
complete the survey and return it in the enclosed, self-addressed stamped
envelope.

If you have any questions, please give us a call at 1-317-578-7490.

Sincerely yours,

The Rhino Shield Team

54. On July 19, an email was sent to Mr. Williams explaining that the job was not yet

done, both as promised and agreed, and that the job closeout documents had not been received,

and that the paint was still peeling, cracking, and blistering on the house. Williams did not

respond.

55. When there was no response, another follow up email was sent by Mark Hunter to

Mr. Williams on July 25, 2013 which states:

"It has been six days since I emailed you advising you that the project is not complete.

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 29 of 35 PAGEID #: 204
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E34

The only action that has taken place was a phone call to Dave Hunter indicating staff would be in touch. Alex called and indicated he would be on site either Saturday July 20, 2013 or Sunday July 21, 2013. No call and no staff showed up either day.

Rudy called on Wednesday July 24, 2013 and spoke to Ruth Hunter; he indicated someone would be at the site today. Verbal communication is unacceptable. As discussed and agreed to at our on-site meeting I am the single point of contact for project close out
Please forward a written work plan on disposing of all deficiency items. This work plan should include disposing of all administrative items, scope work and corrections to cleaning up items that have been created as a result of the work. The work plan should be submitted within Seventy-Two hours. The work scheduled and completed prior to Thursday August 8, 2013 at 5:00 p.m. "

56.     Rudy called after that and said he would be out on July 20 or 21 to check on things. He never appeared nor called to say he was not going to come out. Rudy called on Wednesday July 24, 2013 and spoke to Ruth Hunter. He said that someone would be at the site that day. Nobody appeared that day, but "Alex" came the next day.

57.     The Hunters called again, this time adding their concerns about coating on the front door that needed to be removed or repaired. On July 25, 2013, a man named "Alex" came to their house at 8:30 p.m. to coat and repair the door. It was too dark to even see what he was doing, and once again he didn't have what he needed, so he had to go to the hardware store. He stayed until approximately 10:00 p.m. The house was filling with bugs from the open door, and the Hunters needed to go to bed, so they had to contact Jim Williams to put a stop to it so they could go to bed.

58.     On July 27, 2013, Alex returned to the Hunters' home, supposedly to replace the screens with overspray on them. Unfortunately he again came at around 8:30 p.m. It was again too dark to properly perform the repairs or do the job, so he again did not do the job correctly and instead caused more damage. The following day, the Hunters checked his repair work and found that he had broken the pins that held the screens in. Alex had apparently just placed them in the window frames and left, so the Hunters had to buy new pins.

16

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 30 of 35  PAGEID #: 205
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E35

59.     Each time that Rhino Shield or the defendants attempted to fix something, they not only failed, but created more damage or made the repairs worse than the original work.

60.     The defendants finally tired of trying to correct and repair the extensive damage which had been caused by their original as well as repair work.  They said that the job was done and never came back.

61.     On August 19, 2013, Mark Hunter contacted Rhino Shield at its Florida office hoping to find someone from the company who could address and resolve his parents' problems with the defendants' work.  He spoke with Terry Andre whom he told that it appears that the Rhino product used in his parents' project was defective because it kept peeling, splitting, cracking, and breaking up, and which continues to this day.  Andre said he would speak with Jim Williams to resolve the problem.

62.     When Mark Hunter heard nothing further, he again contacted Rhino Shield on August 30, 2013.  He again spoke with Terry Andre who said he had contacted and emailed Jim Williams about the Hunters' project.  Andre said he would not provide the Hunters with a copy of the email.

63.     The Hunters attempted to repair their property but were told that Tri-State is the exclusive dealer of the product in Ohio and nobody else could remedy the problems with their coating product.  To this day, none of the defendants has followed up or made efforts to complete both the original job and repair the damages caused by the original botched job.  They have refused to back up their warranty and guarantees given directly to the Hunters.

64.     The Hunters contacted Reitter Stucco which provided a repair quote dated September 27, 2013 for $35,968 to repair the damage caused by the defendants and to return the Hunters' property to its proper condition.  A true and accurate copy of the repair estimate is

17

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 31 of 35 PAGEID #: 206
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E36

attached as Exhibit C. On July 31, 2013. Feazel Roofing provided a repair estimate of $3,200 to repair the roof damage caused by the defendants. A true and accurate copy of that repair estimate is attached as Exhibit D.

### Count One - Violations of the Ohio Consumer Sales Practices Act

65.     Plaintiffs reallege paragraphs 1 through 64 above as if fully restated herein.

66.     Defendants through their actions and failures to act, as described more fully above, violated numerous provisions of the Ohio Consumer Sales Practices Act, as codified under R.C. 1345.02-.03, *et seq.* by their unauthorized, illegal, and improper and shoddy home repair work and services. They have committed, among others, multiple unfair and deceptive as well as unconscionable practices and acts relative to their actions and inaction by, among others, failing to perform the work in a workmanlike manner; by failing to complete the work; by misrepresenting their products and services; by failing to make promised repairs of the botched work; by failing to honor their agreements with the Hunters; by falsely using a fictitious name which is not registered with the Ohio Secretary of State; by failing to honor their warranty and guarantees; by reneging and failing to honor an agreement to resolve the botched work and honor their guarantees; by entering an illegal consumer agreement which requires that the Hunters resolve their issues in Indiana; by using sub-contractors to perform work for which they had contracted; and by failing to complete or honor the agreement for the services.

67.     As a direct and proximate result of the defendants' respective violations of the OCSPA, the plaintiffs incurred and suffered compensatory and punitive damages including out of pocket damages, attorney fees and expenses, and other related damages exceeding $25,000 to be proven at trial.

### Count Two - Negligent and/or Intentional Misrepresentation

18

68.     Plaintiffs reallege paragraphs 1 through 67 above as if fully restated herein.

69.     The defendants either negligently and/or intentionally made representations to the Hunters upon which they relied to their detriment including that they would perform the agreed services to the Hunters' satisfaction; that they would guarantee their work; that their services and products were superior to others; that they would repair the botched work; that they would honor their warranties and guarantees; that they would complete the work and repairs to the satisfaction of the Hunters, among other statements and omissions which were false and which they knew or should have known were false when made to the Hunters. The Hunters relied on these representations. The defendants were either negligent or intentionally misleading by making the false representations.

70.     The defendants provided information known to be false and inaccurate, designed to hurt the Hunters in order to force them to pay for services and repairs which the defendants never intended to complete or perform to the extent they represented to the Hunters. They also had other persons who were not Rhino Shield employees perform the services without ever telling the Hunters. They have also failed to correct or remedy the false representations.

71.     As a direct and proximate result of the misrepresentations, the plaintiffs have been damaged in an amount exceeding $25,000 to be proven at trial.

### Count Three - Breach of Contract

72.     Plaintiffs reallege paragraphs 1 through 71 above as if fully restated herein.

73.     On December 31, 2012, the Hunters executed a written agreement with the defendants whom they believed to be Rhino Shield for home repair and painting services described more fully above. A true and accurate copy of the agreement is attached as Exhibit B.

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 33 of 35 PAGEID #: 208
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E38

74.    The plaintiffs have honored the agreement and made all required payments.  The Hunters went beyond the contract and provided the defendants with supplies and utilities and equipment in some instances which were necessary to perform the work.

75.    The defendants breached the agreement by among other things, described more fully above, failing to complete or honor the agreement; by failing to do what was required under the agreement; failing to perform services and repairs; by failing to honor warranties and guarantees; and by doing what they agreed to do from the start and throughout the project.

76.    The defendants also failed and refused to perform their written warranties which provide, as follows:

Tri-State Coating Limited warranty: Tri-State Coating warrants the material is of the quality specified and will transfer to the Customer all manufacturer's written warranties. Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period. Tri-State Coating and Customer agree that all implied warranties including, without limitations, warranties of habitability, fitness for a particular purpose and merchant ability are hereby excluded and there are no warranties or representations which extend beyond those expressly set forth in this agreement.

77.    Along with the June 27, 2013, letter to the Hunters, Jim Williams also included another warranty document titled as Rhino Shield Ceramic Coating, Permanent Coating System, 25 Year Non-Prorated Transferable Limited Warranty, a true and accurate copy of which is attached as Exhibit E.  That warranty includes among other things that it warrants against chipping, flaking or peeling for 25 years and that Rhino Shield would furnish without cost to the Hunters replacement ceramic coating in the event that there is chipping, flaking, or peeling such as occurred with the Hunters' job.  Despite several requests for repair of the damage and enforcement of the warranty, the defendants have refused to provide what they promised in the warranties provided to the Hunters.

78.    As a direct and proximate result, the plaintiffs have incurred damages exceeding $25,000 to be proven at trial.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E39

## Count Four - Violations of the Ohio Home Sales Solicitation Act

79.     Plaintiffs reallege paragraphs 1 through 78 above as if fully restated herein.

80.     Defendants through their actions and failures to act, as described more fully above, violated numerous provisions of the Ohio Home Sales Solicitation Act ("HSSA"), as codified under R.C. 1345.23, *et seq.* by their unauthorized, illegal, and improper conduct as it concerns the contract on December 31, 2012.

81.     Among other things, the contract does not contain the signature of Ruth Hunter as required by Ohio Revised Code 1345.23(A).  Furthermore, it lacks the required notice of cancellation under Ohio Revised Code 1345.23(B).

82.     As a direct and proximate result of the defendants' respective violations of the HSSA, the plaintiffs incurred and suffered compensatory and punitive damages including out of pocket damages, attorney fees and expenses, and other related damages exceeding $25,000 to be proven at trial.

**WHEREFORE**, plaintiffs Ruth and David Hunter hereby demand judgment against defendants Rhino Shield, Tri-State Coatings and Repair LLC ("Tri-State"), Tri-State Coating, Inc., Cleveland Coatings, Inc., James H. Williams, Rudy Pallone, Aleksandre Dgebuadze, John D. Robertson, Rhino Shield Florida, Timeless Coatings LLC, and AmCoat Industries Inc., jointly and severally where applicable, in an amount exceeding $25,000 for both compensatory and punitive damages; treble damages where appropriate; interest on all damages from December 31, 2012; reasonable attorney fees; costs of this action; and whatever further relief this court deems just and appropriate.

Case: 2:18-cv-01097-EAS-EPD Doc #: 5-1 Filed: 10/19/18 Page: 35 of 35 PAGEID #: 210
Franklin County Ohio Clerk of Courts of the Common Pleas- 2016 Jul 07 4:48 PM-14CV001274
0D132 - E40

Respectfully submitted,

*/s/ James P. Connors*
James P. Connors, Esq. (0034651)
**LAW OFFICES OF JAMES P. CONNORS**
580 South High Street, Suite 150
Columbus, Ohio 43215
(614) 221-6868
FAX (614) 221-6889
Email: JClaw221@aol.com
*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand a jury of eight (8) for all triable jury issues contained herein and any claim or defense asserted in this action.

*/s/ James P. Connors*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was served upon counsel for the defendants via ECF this 7th day of July, 2016.

*/s/ James P. Connors*
*Counsel for Plaintiffs*