# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**RUTH A. HUNTER,** *et al.,*

        **Plaintiffs,**

    **v.**

**RHINO SHIELD,** *et al.,*

        **Defendants.**

Case No. 2:18-cv-1097
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

## OPINION & ORDER

Currently pending before the Court are two Motions to Dismiss filed by Defendant Aleksandre Dgebuadze ("Dgebuadze") (ECF No. 39); and collectively by Defendants AmCoat Industries Inc. ("AmCoat"), AmCoat Technologies Incorporated ("AmCoat Tech"), Steven Dominique ("Dominique"), Rudolph Pallone ("Pallone"), Rhino Shield ("Rhino"), Rhino Shield Florida ("Rhino Florida"), Tristate Coating, Inc. ("Tri-state"), and James Williams ("Williams") (referred to collectively as the RS Defendants) (ECF No. 43). Plaintiffs responded to both Motions to Dismiss. (ECF Nos. 45, 51). Defendant Dgebuadze replied. (ECF No. 50). The RS Defendants did not reply, and the time to file such a reply has passed. Accordingly, both matters are ripe for disposition. For the reasons stated herein, Dgebuadze's Motion to Dismiss (ECF No. 39) is **GRANTED in part and DENIED in part** and the RS Defendants' Motion to Dismiss (ECF No. 43) is **DENIED.**

## I.

Plaintiffs Ruth A. Hunter and Mark D. Hunter (as Executor for the estate of David G. Hunter) ("Plaintiffs") commenced this action on September 21, 2018, through the filing of a seven-

count Complaint. (*See* Compl. [ECF No. 1]). On November 8, 2018 Plaintiff filed an eight-count Amended Complaint. (*See* Am. Compl. [ECF No. 18]). Plaintiff asserts claims for: 1) violations of the Ohio Consumer Sales Practices Act (Am. Compl. ¶¶ 187–194); 2) "Negligent and/or Intentional Misrepresentation" (*Id.* ¶¶ 195–201); 3) Breach of Contract (*Id.* ¶¶ 203–211); 4) Violations of the Ohio Home Sales Solicitation Act (*Id.* ¶¶ 212–216); 5) Breach of Express and Implied Warranties and Violations of the Magnuson Moss Warranty Act (*Id.* ¶¶ 217–230); 6) Civil Conspiracy (*Id.* ¶¶ 231–236); 7) "Declaratory Judgment that Defendants are Vicarious Liability [sic] As Agents, Agents by Estoppel, Apparent Authority, and as a Joint Venture" (*Id.* ¶¶ 237–244); and 8) Alter Ego Liability (*Id.* ¶ 245–247).

## A.     Background

For the purposes of the Moving Defendants' Motions to Dismiss, the Court has considered all the facts properly before it and has taken all facts alleged in the Amended Complaint as true. This case stems from the alleged misapplication of Rhino Shield, a ceramic coating, onto the exterior of the Hunters' home. In late 2012, David Hunter ("Mr. Hunter") saw an advertisement for a company referred to as "Rhino Shield," which offered services relating to cleaning and painting the exterior of houses. Mr. Hunter called the number displayed during the advertisement and was connected with a representative who purported that he or she worked for "Rhino Shield."

On November 14, 2012, Pallone, a sales representative from the company that advertised itself as "Rhino Shield," came to the Hunters' home and met with Mr. Hunter. Throughout Mr. Hunter and Pallone's conversation, Pallone represented that he worked for "Rhino Shield," and at no time during the conversation did he state that he represented other business entities. Before leaving, Pallone provided Mr. Hunter with an estimate for "Rhino Shield's" services and, after

describing the benefits of the Rhino Shield coating, Pallone informed Mr. Hunter that if he failed to sign on contract before January 1, 2013, the prices would increase.

On December 31, 2012, Mr. Hunter signed a contract with Tri-State to complete his home repairs. The contract at issue has been attached to Plaintiffs' Amended Complaint as Exhibit J. (*See* Contract [ECF No. 18-1]). The contract listed what services were and were not included in the contract price of $11,998.00. The agreement stated that any check should be made payable to "Rhino Shield." Incorporated into the contract is the "Tri-State Coating Limited warranty" which states:

> Tris-State Coating warrants the material is of the quality specified and will transfer to the Customer all manufacturer's written warranties. Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period. Tri-State Coating and Customer agree that all implied warranties including, without limitations, warranties of habitability, fitness for a particular purpose and merchant ability [sic] are hereby excluded and there are no warranties or representations which extend beyond those expressly set forth in this agreement.

> Tri-State Coating makes no warranties express or implied regarding any of the products or services except the express warranties provided herein. TRI-STATE COATING EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES EXCEPT AS PROVIDED HEREIN. WITHOUT LIMITING THE FOREGOING, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE WITH RESPECT TO THE GOODS OR SERVICES SOLD.

> TRI-STATE COATING WILL NOT BE RESPONSIBLE OR LIABLE FOR INDIRECT OR CONSEQUNTIAL DAMAGES OF ANY KIND, however arising, including but not limited to those for use of any products, loss of time, inconvenience, lost profits, labor charges, or other incidental or consequential damages with respect to persons, business, or property, whether as a result of breach of warranty, breach of contract, negligence or otherwise. Notwithstanding any other provision of this Contract, BUYER'S REMEDY AGAINST TRI-STATE COATING FOR SERVICES SUPPLIED OR FOR NON-DELIEVERED SERVICES OR FAILURE TO FURNISH SERVICE, THER [sic] OR NOT BASED ON NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF EXPRESS WARRANY [sic], IS LIMITED SOLELY TO RETURN OF THE ORDER PRICE ACTUALLY PAID FOR SUCH PRODUCTS

3

OR SERVICES AND IN NO EVENT SHALL TRI-STATE COATING LIABILITY EXCEED THE PRICE OR CHARGE FOR SUCH PRODUCTS OR SERVICES.

(Contract at 2) (emphasis in original). Pallone did not review the Contract's second page with Mr. Hunter. They discussed only the first page, which details the pricing. The Limited Warranty clause is on the second page of the Contract. And no one from Tri-State signed the Contract signed by Mr. Hunter.

Work began on the Hunters' home on or about May 3, 2013. (Am. Compl. ¶ 146). The workers, whom the Hunters presumed to be "Rhino Shield" employees, began work on May 3, 2013 by pressure washing the house. On May 4, 2013, John Robertson ("Robertson") and two other unidentified individuals arrived at the Hunters' house. At the time, the Hunters presumed these individuals too were Rhino Shield employees but have since learned that the workers were actually subcontractors. (*Id.* ¶ 150). Robertson prepared the coating to be applied to the Hunters' home on May 4, 2013. He and his men prepared the house by taping around windows and doors. However, they ran out of tape, which later caused some areas to be improperly coated. (*Id.* ¶ 151). Another contractor that "Rhino Shield" hired to work on the Hunters' home was Dgebuadze. However, the Hunters asserted that Dgebuadze "holds himself out as Rhino Shield;" and claimed that Dgebuadze was one the contractors who is "primarily responsible" for the damage done to their home. (*Id.* ¶ 99).

The Hunters allege that Defendants further failed to comply with the Contract, such failures including: 1) failing to replace bad or damaged wood, (Am. Compl. ¶ 152); 2) failing to caulk and seal the cracks in the stucco, (*id.* ¶ 153); 3) failing to repair cracks in the stucco and inspect the stucco prior to applying the coating, (*id.* ¶ 154); 4) failing to clean the stucco before applying the

4

coating, (*id.*); 5) failing to remove the downspouts prior to applying the coating, (*id.*); 6) failing to cover the roof, (*id.*).

When the Hunters brought their concerns to Pallone, he acknowledged the problems, but he assured the Hunters that all the problems would be fixed and the area would be clean. The Plaintiffs assert that the damage to their home caused by the work crew has yet to be corrected. Moreover, Plaintiffs assert that the Rhino Shield coating applied to their home is defective and that it was not applied to the advertised thickness. As such, the Hunters claim that the Rhino Shield coating "continues to peel, split, crack, blister, and break." (Am. Compl. ¶ 159).

On June 7, 2013, the Hunters met with Pallone and told him the "issues, deficiencies, and problems" that they had with the Rhino Shield coating and the application of the coating onto their home. (Am. Compl. ¶ 161). The Hunters detailed to Pallone the areas that they believed needed to be repaired pursuant the warranties. Pallone communicated to the Hunters that he lacked the authority to approve repairs for the alleged damage done to the Hunters roof and told them that "only Jim Williams could do that." (*Id.*). However, Pallone assured the Hunters that the other damages would be repaired. (*Id.*). It was after this meeting, on June 7, 2013, that the Hunters first realized that they were dealing with an entity other than "Rhino Shield," as "Tri-State Coating" was listed on the sign in sheet for the meeting. (*Id.* ¶ 162).

Mr. Hunter then conducted an internet search of "Rhino Shield" and found a Florida-based company that went by that name, but that also called itself "AmCoat." (*Id.* ¶ 163). Mr. Hunter contacted the Florida Rhino Shield company and spoke with Terry Andre who stated his company was Rhino Shield and that he worked with a Jim Williams. (*Id.* ¶¶ 163–64). On June 12, 2013 Williams sent a letter apologizing to the Hunters. In this letter, Williams told the Hunters that the job would be completed as early as June 14, 2013 and that they would work to fix the items on the

warranty list provided to the Hunters. (*Id.* ¶ 166; *see also* 6/12/2013 Williams Letter [ECF No. 18-2]).

On June 13, 2013, Pallone emailed the Hunters acknowledging that certain repairs needed to be made and inquiring whether the Hunters were amiable to the repairs taking place on that Saturday. (6/13/2013 Pallone Email [ECF No. 18-4, PAGEID #: 415]). Williams emailed the Hunters on June 14, 2013 and set up a meeting with them on June 15, 2013 at their home to further discuss the issues. The meeting was later changed to June 19, 2013. (*See* 6/14/2013 Williams Email [ECF No. 18-4, PAGEID #: 417]).

During the June 19, 2013 meeting, Williams came to the Hunters' home and inspected the property along with Pallone and the Hunters. (*Id.* ¶ 169). Williams acknowledged the poor quality of the work completed at the Hunters' residence and promised them that their home would be repaired quickly. Williams also "promised to stay until the job and repairs were completed" but never returned to Hunters' home after the June 19th meeting. (*Id.* ¶¶ 169–70). Ultimately, the Hunters allege, that none of the damage done to the their property was ever properly repaired; neither were the issues the Hunters had with the Rhino Shield coating itself ever rectified. (*See id.* ¶ 185). The Hunters have received repair quotes from other companies for restoring their home to its original in the amount of $105,827.01 as of 2017. (*Id.* ¶ 186).

**B.    State Court Litigation**

The Plaintiffs first initiated claims predicated on the alleged misapplication of Rhino Shield in the Franklin County Court of Common Pleas on February 6, 2014. On March 11, 2014, Tri-State filed a Third-Party Complaint against Dgebuadze; service was completed upon Dgebuadze on March 18, 2014 but he did not respond nor did an attorney enter an appearance on his behalf.

The Hunters filed a Motion for Leave to File an Amended Complaint on September 4, 2014. The state trial court granted the Hunters' motion on October 9, 2014. On March 11, 2015, the Hunters filed a motion for default judgment against Dgebuadze, which was granted on November 10, 2015. The Hunters voluntarily dismissed the state court action against defendants Rhino Shield, Williams, Pallone, and Tri-State Coating, on September 22, 2017. But the action was not dismissed against Dgebuadze.

Dgebuadze moved for the state court to vacate the default judgment, asserting that the state court lacked personal jurisdiction over him as he was never properly served with the state court amended complaint on December 6, 2017. On February 22, 2018, a hearing was held regarding Dgebuadze's motion to vacate. And on March 9, 2018, Dgebuadze's motion was granted and the action against him was dismissed as he was never properly served with the state court amended complaint within one-year of the filing date.

The Hunters appealed the state trial court's dismissal. Ohio's Tenth District Court of Appeals affirmed the state trial court's decision and denied the Hunters' motion for rehearing. On July 30, 2018, the Hunters filed a petition with the Supreme Court of Ohio regarding the Tenth District's affirmance of the state trial court's decision.

## C. Procedural History

Aforementioned, Dgebuadze and the RS Defendants (collectively the "Moving Defendants") have filed Motions to Dismiss Plaintiffs' Amended Complaint asserting: 1) lack of subject matter jurisdiction; and 2) failure to state a claim upon which relief can be granted. (*See* RS Defs. Mot. [ECF No. 43]; Dgebuadze Mot. [ECF No. 39]). Dgebuadze also moves the Court to dismiss the Amended Complaint under a theory of abstention. (*See* Dgebuadze Mot. at 16–18). Plaintiffs replied to the Moving Defendants' Motions. (*See* Pl. Opp'n to Dgebuadze [ECF No.

45]; Pl. Opp'n to RS Defs. [ECF No. 51]). Dgebuadze replied, (Dgebuadze Reply [ECF No. 50]); and the time for the RS Defendants to file a reply has passed. As such, both motions are ripe for review.

## II. Subject Matter Jurisdiction

### A. 12(b)(1) Standard

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Federal courts have subject matter jurisdiction in civil actions if: 1) the action arises under federal law, *see* 28 U.S.C. § 1331 (federal-question jurisdiction); or 2) the action is between citizens of different states where the amount in controversy exceeds $75,000, *see* 28 U.S.C. § 1332 (diversity jurisdiction).

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the court lacks subject matter jurisdiction. Without subject matter jurisdiction, a federal court lacks authority to hear a case. *Thornton v. S.W. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990). Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack under Rule 12(b)(1) "questions merely the sufficiency of the pleading," and the trial court therefore takes the allegations of the complaint as true." *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.3d 320, 325 (6th Cir. 1990)). To survive a facial attack, the complaint must contain a short and plain statement of the grounds for jurisdiction. *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). A factual attack is a challenge to the factual existence of subject matter jurisdiction. No presumptive truthfulness applies to the factual allegations. *Glob. Tech., Inc. v. Yubei (XinXiang Power Steering*

8

*Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (quoting *Carrier Corp v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012)).

When subject matter jurisdiction is challenged, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986); *see also DLX, Inc. v. Kentucky*, 381 F.3d 511, 5116 (6th Cir. 2014); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

**B.    Analysis**

The Moving Defendants assert that the Court lacks jurisdiction over this case because: 1) there is not complete diversity between the parties; 2) Plaintiffs have failed to meet the jurisdiction requirement under the Magnuson-Moss Warranty Act; and 3) Plaintiffs' Magnuson-Moss Warranty Act claim is time-barred. Plaintiffs submit that this Court has subject matter jurisdiction because: 1) all plaintiffs are diverse in citizenship from all defendants; and 2) they have asserted a federal claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 1331. *(See Am. Compl. ¶ 3).*

**1.    Federal Question Jurisdiction**

Plaintiffs' Amended Complaint alleges that Defendants violated the Magnuson-Moss Warranty Act ("Magnuson-Moss"). (Am. Compl. ¶¶ 217–230). Magnuson-Moss states that a "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied, warranty, or service contract, may bring suit for damages and other legal in equitable relief" in a federal district court subject to an amount in controversy requirement. 15 U.S.C. § 2310(d)(1). A federal district court lacks jurisdiction to hear Magnuson-Moss claims "if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to

9

be determined in this suit." 15 U.S.C. § 2310(d)(3).

The Moving Defendants assert that federal question jurisdiction cannot be predicated upon Plaintiffs' Magnuson-Moss claim because: 1) the claim is time-barred and not subject to the state's savings statute; and 2) Plaintiffs' pleading of damages in excess of $750,000 was not pleaded in good faith and Plaintiffs cannot establish the Magnuson-Moss's $50,000 amount-in controversy requirement under the federal statute.

### a.    Ohio Savings Statute

The parties dispute which statute of limitations controls Plaintiffs' Magnuson-Moss claim. The Moving Defendants submit that the Uniform Commercial Code's ("UCC") four-year statute of limitations governs, while the Plaintiffs submit that an eight year statute of limitations is applicable. The Court need not decide which statute of limitations is appropriate at this time as, even if the UCC's statute of limitations controls this claim, Plaintiffs' Magnuson-Moss claim is timely under Ohio's savings statute.

Ohio Revised Code, Section 2305.19, in pertinent part, provides:

> In any action that is commenced or attempted to be commenced, if in due time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, the plaintiff or, if the plaintiff dies and the cause of action survives, the plaintiff's representative may commence a new action within one year after the date of the reversal of the judgment or the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later. . . .

Ohio Rev. Code § 2305.19(A). "By its terms the Ohio Saving statute allows a plaintiff who voluntarily dismisses an action after the statute of limitations has run to refile the action within one year of dismissal." *Fuller v. Cuyahoga Metro. Hous. Auth.*, 334 F. App'x 732, 737 (6th Cir. 2009) (citing Ohio Rev. Code § 2305.19) (footnote omitted). "The savings statute applies when the original suit and the new action are substantially the same." *Children's Hosp. v. Ohio Dep't*

10

*of Pub. Welfare*, 69 Ohio St. 2d 523, 525, 433 N.E.2d 187 (Ohio 1982). "A new complaint is substantially the same as the original complaint for purposes of the saving statute when the new complaint differs only to the extent that it adds new recovery theories based upon the same factual occurrences stated in the original complaint." *Stone v. N. Star Steel Co.*, 152 Ohio App. 3d 29, 35, 786 N.E.2d 508 (Ohio App. Mar. 14, 2003) (citing *Lanthorn v. Cincinnati Ins. Co.*, 2002-Ohio-6798, at ¶ 27 (Ohio App. Dec. 5, 2002); *Vercellotti v. HVC-Daly, Inc.*, No. L-97-1063, 1997 WL 770964 (Ohio App. Dec. 5, 1997); *Jones v. St. Anthony Med. Ctr.*, No. 95-APE-08-1014, 1996 WL 70997 (Ohio App. Feb. 20, 1996); *Andrews v. Scott Pontiac Cadillac GMC, Inc.*, No. S-88-37, 1989 WL 57618 (Ohio App. June 9, 1989)).

Plaintiffs originally brought a case arising out of the same set of facts and against many of the same named Defendants in the Franklin County Court of Common Pleas in February 2014, well within the statute of limitations. Plaintiffs voluntarily dismissed that action against the majority of the Defendants on September 22, 2017. And the Ohio state trial court dismissed the action without prejudice[1] as to Dgebuadze for Plaintiffs' failure to properly serve him with the state court amended complaint. Plaintiffs' commenced the present action on September 21, 2018, less than one-year after the prior litigation failed otherwise than upon the merits. Thus, Plaintiffs have satisfied the first prong of the analysis.

The Court now turns to whether Plaintiffs' Amended Complaint in the present action is substantially the same to the allegations set forth in the previous litigation. "When determining whether the new complaint and the original complaint are substantially the same, a court must determine whether the allegations in the first action gave the defendant fair notice of the type of

---

[1] The Court notes, as further detailed in the fact section of this Opinion, that the Ohio Tenth District Court of Appeals have affirmed the state trial court's dismissal for failure to serve Dgebuadze and that the Hunters appealed that affirmance.

11

claims asserted in the second action." *Id.* "If a re-filed complaint does add additional theories of recovery, those theories must be based upon allegations set forth in the original complaint which would give the defendant or defendants fair notice of the claims added to the second action." *Carl L. Brown, Inc. v. Lincoln Nat. Life Ins.*, 2003-Ohio-2577, at ¶ 42 (Ohio App. May 20, 2003) (citing *Lanthron*, 2002-Ohio-6798; *Vercellotti*, 1997 WL 770964; *Jones*, 1996 WL 70997). "As a matter of policy, the saving statute is to be liberally construed so that controversies are decided upon important substantive questions rather than upon technicalities of procedure." *Stone*, 152 Ohio App. 3d at 35.

The parties agree that Plaintiffs did not specifically allege a breach of warranty claim in the predecessor state court action. However, Plaintiffs submit that their breach of contract claim was predicated, in part, on an alleged breach of warranties. (Pl. Opp'n to Dgebuadze at 15–18; Pl. Opp'n to RS Defs. at 18–21). Plaintiffs' breach of contract claim, in the state court litigation, is as follows:

### Count Three – Breach of Contract

72.     Plaintiffs reallege paragraphs 1 through 71 above as if fully restated herein.

73.     On December 31, 2012, the Hunters executed a written agreement with the defendants whom they believed to be Rhino Shield for home repair and painting services described more fully above. A true and accurate copy of the agreement is attached as Exhibit B.

74.     The plaintiffs have honored the agreement and made all required payments. The Hunters went beyond the contract and provided the defendants with supplies and utilities and equipment in some instances which were necessary to perform the work.

75.     The defendants breached the agreement by among other things, described more fully above, failing to complete or honor the agreement; by failing to do what was required under the agreement; failing to perform services and repairs; *by failing to honor warranties and guarantees*; and by doing what they agreed to from the start and throughout the project.

76.    *The defendants also failed and refused to perform their written warranties* which provide, as follows:[2]

Tri-State Coating Limited warranty. Tri-State Coating warrants the material is of the quality specified and will transfer to the Customer all manufacturer's written warranties. Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer on written notice from Customer within such period. Tri-State Coating and Customer agree that all implied warranties including without limitations, warranties of habitability, fitness for a particular purpose and merchant ability are hereby excluded and there are no warranties or representations which extend beyond those expressly set forth in this agreement.

77.    Along with the June 27, 2013, [sic] letter to the Hunters, Jim Williams also included another warranty document titled as Rhino Shield Ceramic Coating, Permanent Coating System, 25 Year Non-Prorated Transferable Limited Warranty, a true and accurate copy of which is attached as Exhibit E. That warranty includes among other things that it warrants against chipping, flaking or peeling for 25 years and that Rhino Shield would furnish without cost to the Hunters replacement ceramic coating in the event that there is chipping, flaking, or peeling such as occurred with the Hunters' job. Despite several requests for repair of the damage and enforcement of the warranty, the defendants have refused to provide what they promised in the warranties provided to the Hunters.

78.    As a direct and proximate result, the plaintiffs have incurred damages exceeding $25,000.

(State Am. Compl. ¶¶ 72–78 [ECF No. 39-1]) (emphasis added). Plaintiffs submit that this breach of contract claim provided fair notice to the Moving Defendants of the present Magnuson-Moss claim.

The Moving Defendants disagree with Plaintiffs' assertion that the state court breach of contract claim provided them with fair notice of the present Magnuson-Moss claim. Dgebuadze asserts Plaintiffs' Magnuson-Moss claim is time-barred because: 1) Plaintiffs did not previously

---

[2] The text provides:

Tri-State Coating Limited warranty: Tri-State Coating warrants the material is of quality specified and will transfer to the Customer all manufacturer's written warranties. Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period. Tri-State Coating and Customer agree that all implied warranties including, without limitations, warranties of habitability, fitness for a particular purpose and merchantability are hereby excluded and there are no warranties or representations which extend beyond those expressly set forth in this agreement.

assert a Magnuson-Moss claim; 2) Plaintiffs now, without previously having done so, allege that Dgebuadze was an owner or operator of the "Rhino Shield" joint venture and, as such, he extended certain warranties to Plaintiffs; and 3) Plaintiffs make conclusory statements, without providing factual support, that Dgebuadze held himself out as Rhino Shield. Further, Dgebuadze asserts:

> even if Plaintiffs could allege that any of Tri-State's warranties or their communications with Defendants Williams and Pallone could be imputed against Defendant Dgebuadze, these allegations of 'joint ownership', having never having [sic]been raised before, cannot make use of the Ohio Savings Statute to evade the bar of a relevant statute of limitations.

(Dgebuadze Mot. at 9) (emphasis in original).

Dgebuadze is correct that Plaintiffs did not previously assert a Magnuson-Moss claim in the prior action; however, that alone does not render Plaintiffs' current Magnuson-Moss claim time-barred. The Court is called to decide whether the new complaint is substantially *similar* to the old complaint, not whether the complaints are identical. In an effort to demonstrate the dissimilarities between the state court amended complaint and the Amended Compliant filed with this Court, Dgebuadze asserts that Plaintiffs did not previously allege him to be in the "Rhino Shield" joint venture. However, as Plaintiffs correctly point out, the state court amended complaint contains the following allegations:

- "[T]he defendants, who are collectively and individually known as 'Rhino Shield'", (State Am. Compl. ¶ 1);

- "Defendants are collectively and individually known as 'Rhino Shield' in one form or another, and are believe to be a loosely organized group of foreign and domestic corporations, limited liability companies, and/or individuals based in Indiana, Kentucky, Florida, Michigan, or perhaps some other state[,]" (*id.* ¶ 3);

- "'Rhino Shield' conducts business with unsuspecting consumers across the country without indication of its true or accurate corporate or company status, nor without properly registering, as it concerns Ohio, with the Ohio Secretary of State or being properly licensed to legally conduct business in Ohio and elsewhere[,]" (*id.* ¶ 4).

Thus, while the Hunters' state court amended complaint did not use the term "joint venture," it did describe one, giving Dgebuadze adequate notice that he could be later accused of being a joint venturer with the other named Defendants for the conduct alleged.

The RS Defendants argument is equally unpersuasive. The RS Defendants assert that the Ohio savings statute is inapplicable, positing that the Court should doubt the authenticity of Plaintiffs' Magnuson-Moss claim given that Plaintiffs failed to allege such claim in their original Compliant filed in this Court. The RS Defendants state:

> Plaintiffs attempted to initially assert federal jurisdiction solely on the basis of diversity, which was absent. . . . On November 8, 2018[, P]laintiffs filed a First Amended Complaint and alleged for the first time in almost five years of litigation that they had a claim under Magnuson-Moss. This is an obvious attempt to circumvent the jurisdictional hurdles that Plaintiffs' cannot otherwise clear.

(*Id.*). But Plaintiffs' motivation for asserting a Magnuson-Moss claim is largely irrelevant into the inquiry as to whether the state court amended complaint is substantially similar to the Plaintiffs' Amended Complaint in this action.

As stated *supra*, the Court is to liberally construe the Ohio savings statute so that the action before it, if possible, can be decided on the merits. And under a liberal construction, Plaintiffs' Magnuson-Moss claim in the current action is merely an additional theory of recovery based upon allegations contained in the state case. Plaintiffs' state case breach of contract claim was based, in part, on an alleged breach of warranty. And Plaintiffs' Magnuson-Moss claim is, at its essence, an Ohio breach of warranty claim. *See e.g., In re Anheuser-Busch Beer Labeling Mktg. & Sales*

*Practices Litig.*, 644 F. App'x 515, 517 (6th Cir. 2016) (noting that Section 109(d) of the Magnuson-Moss Warranty Act "creates a federal cause of action for the violation of a warranty implied by state law"); *see also Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 540 (E.D.N.Y. 2006) ("The [Magnuson-Moss Warranty Act] . . . creates no additional bases for liability, but allows a consumer to recover damages under existing state law, and attorneys fees."). Thus, the state court amended complaint and the Amended Complaint in this action are sufficiently similar and Plaintiffs' Magnuson-Moss claim is not time-barred as it is subject to the Ohio savings statute.

### b.    Amount in Controversy

The Magnuson-Moss creates a federal cause of action based on a breach of a state law warranty or warranties. *See* 15 U.S.C. §§ 2301(7), 2310(d)(1)(B). To hale an otherwise state breach of warranty claim into federal court, the party seeking federal jurisdiction must establish that plaintiff's claim meets the $50,000 statutory amount in controversy requirement. 15 U.S.C. § 2310(d)(3)(B). Generally, the Court takes a plaintiff's well-pleaded amount-in-controversy as true.

The Sixth Circuit has adopted the "legal certainty" standard that is used to compute the amount in controversy requirement in diversity cases to apply the Magnuson-Moss amount in controversy requirement. *See Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 884 (6th Cir. 2005) (citing *Rosen v. Chrysler Corp.*, 205 F.3d 918, 920–21 (6th Cir. 2000)). Thus, "the amount claimed by the plaintiff in his complaint determines the amount in controversy, unless it appears to a legal certainty that the claim is for less than the jurisdictional amount." *Id.*

Here, the Moving Defendants submit that Plaintiffs' assertion for damages in excess of $750,000 was not pleaded in good faith. The Moving Defendants assert that, under the contract,

16

Plaintiffs are entitled to only the contract price, $11,998.00. Plaintiffs maintain that they are entitled to damages exceeding the amount-in-controversy requirement.

"Remedies for breach of warranty can be limited in accordance with provisions of sections 1302.92 and 1302.93 of the Revised Code . . . ." Ohio Rev. Code § 1302.29(D). Under the Revised Code:

> The agreement may provide for remedies in addition to or in substitution for those provided in sections 1302.01 to 1302.98 of the Revised Code and may limit or alter the measure of damages recoverable under those sections, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.

Ohio Rev. Code § 1302.93(A)(1). However, "[t]he limitation [or exclusion or remedies] must be a part of the parties' bargain in fact." *Ins Co. of N. Am. v. Automatic Sprinkler Corp.*, 67 Ohio St. 2d 91, 96, 423 N.E.2d 151 (Ohio 1981); (citing Nordstrom, *Law of Sales*, § 89, at 276 (1970)) (internal quotations omitted); *see also Haithcock v. Graham Ford, Inc.*, No. 81-AP-935, 1982 WL 4614, at *5 (Ohio App. Dec. 30, 1982). The "[i]nclusion of a remedy limitation in the parties' agreement is essential because '[a] limitation of remedy is binding only because it is a term of the contract between the parties.'" *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 750, 2016-Ohio-7707 (Ohio App. Nov. 10, 2016) (citations omitted).

In order for the Moving Defendants to rely on the warranty's limitation clause, the bargain between the Plaintiffs and the Defendants must include the Limited Warranty. *See Volovetz*, 74 N.E.3d at 750. Further, "exculpatory provisions in contracts are to be strictly construed so as not to relieve one from liability for his own negligence unless it is 'expressed in clear and unequivocal terms.'" *Swartzentruber v. Wee-K Corp.*, 117 Ohio App. 3d 420, 424, 690 N.E.2d 941 (Ohio App. Plaintiff attached the contract to the Amended Complaint. (*See* Contract [ECF No. 18-1]). The second page of the two-page long contract contains the following:

17

Tri-State Coating Limited warranty: Tri-State Coating warrants the material is of the quality specified and will transfer to the Customer all manufacturer's written warranties. Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period. Tri-State Coating and Customer agree that all implied warranties including, without limitations, warranties of habitability, fitness for a particular purpose and merchant ability [sic] are hereby excluded and there are no warranties or representation which extend beyond those expressly set forth in this agreement.

* * *

TRI-STATE COATING WILL NOT BE RESPONSIBLE OR LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND, however arising, including but not limited to those for use of any products, loss of time, inconvenience, lost profits, labor charges, or other incidental or consequential damages with respect to persons, business, or property, whether as a result of breach of warranty, breach of contract, negligence or otherwise. Notwithstanding any other provision of this Contract, BUYER'S REMEDY AGAINST TRI-STATE COATING FOR SERVICES SUPPLIED OR FOR NON-DELIVERED SERVICES OR FAILURE TO FURNISH SERVICES, THER [sic] OR NOT BASED ON NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF EXPRESS WARRANY [sic], IS LIMITED SOLELY TO RETURN OF THE ORDER PRICE ACTUALLY PAID FOR SUCH PRODUCTS OR SERVICES AND IN NO EVENT SHALL TRI-STATE COATING LIABILITY EXCEED THE PRICE OR CHARGE FOR SUCH PRODUCTS OR SERVICES.

(Contract at 2) (emphasis in original). The price of the contract was $11,998.00. (*Id.* at 1). Thus,

the Moving Defendants assert that the Plaintiffs are legally barred from collecting more than

$11,998.00 for their Magnuson-Moss claim, well below the jurisdictional threshold of $50,000.

However, this liability waiver has already been analyzed. In the predecessor state action,

the trial court found:

[T]hat the clause attempting to limit liability is ambiguous and inconsistent with the limited warranty provision. The terms regarding the limitation of liability and the available remedies to Plaintiffs under the Agreement are not clear and unequivocal. For example, the limited warranty provision provides that Tri-State warrants workmanship for two years and will remedy substantial defects without charge to the customer. However, the exculpatory provision provides that the customer's remedy for services supplied or failure to furnish services – whether arising from negligence, breach of contract or breach of warranty – is limited solely

18

> to the return of the purchase price paid for the products or services. Accordingly,
> as the Court concludes that the contract language is ambiguous, the parties' intent
> remains a question of fact for trial.

(State Ct. Denial of Partial Summ. J. at 3 [ECF No. 51-1]). And the Court is disinclined, at this stage of the proceedings, to rule contrary to the state trial court. Thus, it is not clear, to a legal certainty, that Plaintiffs cannot collect damages in excess of the jurisdictional threshold. As Plaintiffs have sufficiently pleaded a federal claim, the Court need not address whether there is complete diversity between the parties. The Moving Defendants' motions to dismiss for lack of subject matter jurisdiction are **DENIED**.

## III.    Abstention

### A.    Standard

In *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), the United States Supreme Court set forth factors for courts to consider when deciding whether dismissing a federal action when there is a concurrent state action pending is appropriate. In *Romine v. Compuserve, Corp.*, 160 F.3d 337 (6th Cir. 1998), the Sixth Circuit adopted the *Colorado River* abstention doctrine. "Abstention is 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'" *Caudill v. Wubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)).

"The threshold question in *Colorado River* abstention is whether there are parallel proceedings in state court." *Bates v. Van Buren Twp.*, 122 F. App'x 803, 806 (6th Cir. 2004) (citing *Crawley v. Hamilton Cty. Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984)). However, the state court proceedings do not have to be identical, rather only "substantially similar." *Romine*, 160

F.3d at 340. In considering whether parallel proceedings are "substantially similar," the Court considers the following factors:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained . . . (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340–41. "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a given case' depending on the particular facts at hand.'" *Id.* at 341 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15–16 (1983)).

**B.    Analysis**

Dgebuadze[3] submits that the Court should refrain from exercising jurisdiction over Plaintiffs' claims under the *Colorado River* abstention policy. (Dgebuadze Mot. at 16–17). He claims that "nearly all of the *Colorado River* factors argue in favor of dismissing Plaintiffs' claims." (*Id.* at 18). Plaintiffs assert: "Defendant [Dgebuadze] fails to meet any of the factors to be considered when deciding whether to abstain. [And t]here are no exceptional circumstances present which would warrant abstention." (Pl. Resp. to Dgebuadze at 29). Further, Plaintiffs state that the appeal "has nothing to do with the claims asserted in this action[,]" and concerns the state court's entry of default against Dgebuadze. (*Id.*).

"[S]o long as 'the parties are substantially similar,' and the claims raised in both suits are 'predicated on the same allegations as to the same material facts,' the two actions will come close

---

[3] RS Defendants have not advanced that this Court should abstain from hearing the case at bar. (*See generally* RS Defs. Mot.).

enough to count as parallel." *Preferred Care of Del., Inc. v. VanArsdale*, 676 F. App'x 388, 393 (6th Cir. 2017) (quoting *Romine*, 160 F.3d at 337).

Plaintiffs contend there is no parallel state court proceeding because the only pending related case before the state court is an appeal as to the default judgment entry against Dgebuadze. On March 11, 2015, the Hunters filed a motion for default judgment against Dgebuadze, which the state court granted on November 10, 2015. A damages hearing was set for January 9, 2018. The Hunters voluntarily dismissed the state court case against all defendants in that action except Dgebuadze on September 22, 2017. On December 6, 2017, Dgebuadze moved for the state court to vacate the November 10, 2015 entry of default against him stating that the judgment was void because the court did not have personal jurisdiction over him as the Hunters failed to serve him. The state court held a hearing on February 22, 2018. And on March 9, 2018 the state court: 1) granted Dgebuadze's motion to vacate the entry of default; and 2) dismissed the action against Dgebuadze as he was never properly served and more than one year had passed since the Hunters filed the Amended Complaint. *See Hunter v. Pallone*, No. 14-cv-1274 (Franklin Cty. Ct. of Comm. Pleas Mar. 9, 2018).

The Tenth District Court of Appeals affirmed the Common Pleas Court's decision and denied the Hunters' motion for rehearing. *See Hunter v. Rhino Shield, et al.*, No. 18-AP-244, Memo Dec. Denying Rehearing, (10th Dist. Ohio App. June 13, 2019). The Hunters have filed a petition for the matter to be heard by the Ohio Supreme Court. *See Hunter v. Rhino Shield*, No. 18-AP-244, Petition to Ohio Supreme Ct. (10th Dist. Ohio App. July 30, 2018).

The Court finds that, given the Tenth District Court of Appeal's decision to vacate the entry of default and dismissal of the case without prejudice, there is no parallel state court proceeding.[4] While the Court is aware that the Hunters have petitioned the Ohio Supreme Court to hear this case, the Court finds that petition insufficient to demonstrate parallel state court proceedings at this time. Thus, as there are no parallel state court proceedings, there is no reason for the Court to abstain from this matter and Dgebuadze's Motion for Abstention is **DENIED**.

## IV.     Failure to State a Claim

### A.     12(b)(6) Standard

Federal Rule of Civil Procedure 12 authorizes dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, the complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, the Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere

---

[4] The Tenth District Court of Appeals has recently denied reconsidering its decision to affirm the trial court.

speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Further, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 662. As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, the complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *See id.*; Fed. R. Civ. P. 8(a).

## B. Analysis

### 1. Dgebuadze 12(b)(6) Motion

Dgebuadze submits that dismissal of Plaintiffs' Magnuson-Moss claim against Dgebuadze is appropriate because he "issued no express warranties or advertisements to Plaintiffs, nor had any contractual privity with Plaintiffs." (Dgebuadze Mot. at 10). Essentially, Dgebuadze argues that, as an independent contractor and not an employee or agent of "Rhino Shield" or Tri-State, he was incapable of, and in fact did not, make any warranties to the Plaintiffs. (*See id.*). Plaintiffs respond that Dgebuadze is an employee of "Rhino Shield" and/or Tri-State. Plaintiffs assert that Dgebuadze held himself out as "Rhino Shield" in all Plaintiffs' interactions with him, and that other "Rhino Shield" employees referred to Dgebuadze as "the company foreman." Thus, Plaintiffs posit, Dgebuadze and the other named Defendants were in a joint venture.

To state a cognizable claim under Magnuson-Moss, a plaintiff must demonstrate: "(i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005) (citing *Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955,

23

961 (N.D. Ohio 1997)); *see also In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 818 (S.D. Ohio 2012); *Teerling v. Fleetwood Motor Homes*, No. 99-5926, 2001 WL 641337, at *8–*9 (N.D. Ill. June 4, 2001); *Sharkus v. Daimler Chrysler Corp.*, No. 79218, 2002 WL 31319119, at *2 (Ohio App. Oct. 17, 2002) ("The Magnuson Moss Warranty Act creates a cause of action for a consumer damaged by the failure of warrantor [sic] to comply with its obligations under a written warranty or under the Act."); *Lawhorn v. Joseph Toyota, Inc.*, 141 Ohio App. 3d 153, 155, 750 N.E.2d 610 (Ohio App. Jan. 19, 2001) ("The Act does not require that a warranty be provided, it merely requires that if a warranty is extended, [the warrantor] must comply with its terms."). "Ultimately, the applicability of the Magnuson-Moss Act is directly dependent upon a sustainable claim for breach of warranty." *Id.* (citing *Labonte v. Ford Motor Co.*, No. 74855, 1999 WL 809808, at *7 (Ohio App. Oct. 7, 1999). Therefore, if there is no cognizable warranty claim against a defendant, there can similarly be no Magnuson-Moss claim against that defendant. *Id.* (citing *Labonte*, 1999 WL 809808, at *7). And, under Ohio law, "[a]bsent a contractual relationship between the plaintiff and defendant, an action based upon contract for breach of warranty does not exist." *Acme Steak Co., Inc. v. Great Lakes Mech. Co.*, Nos. 98-CA-146, 98-CA-243, 2000 WL 1506199, at *4 (Ohio App. Sept. 29, 2000) (citing *Lawyers Coop. Publ'g Co. v. Muething*, 603 N.E. 2d 969, 972 (Ohio 1992)).

Plaintiff asserts that the requisite contractual relationship between Dgebuadze and the Hunters exists because Dgebuadze and the other named Defendants entered into the joint venture of "Rhino Shield." To establish the existence of a joint venture, the party must demonstrate: "[A] contract, express or implied, between the joint adventurers to engage in a specific business enterprise, which contract does not, however create, the formal relationship of partnership." *Ford v. McCue*, 163 Ohio St. 498, 504, 127 N.E.2d 209 (Ohio 1955). And "whether the parties have

24

the relationship of joint venturers as a matter of law depends upon the facts and circumstances of the case." *Kahle v. Turner*, 66 Ohio App. 2d 49, 52, 420 N.E.2d 127 (Ohio App. Oct. 10, 1979).

Plaintiffs allege that Dgebuadze and other named Defendants hold themselves out as "Rhino Shield," an allegedly fictitious entity and that Dgebuadze identifies himself "as Rhino Shield when dealing with consumers and customers in Ohio." (Am. Compl. ¶¶ 77, 99). However, Plaintiffs provide no factual support of times in which Dgebuadze allegedly communicated that he was "Rhino Shield." In their response to Dgebuadze's Motion to Dismiss, Plaintiffs assert: "Dgebuadze is insured by 'Rhino Shield[.]" (Pl. Opp'n to Dgebuadze at 19). However, this assertion is not well taken. Plaintiffs' Amended Complaint states that "Dgebuadze is a contractor who was hired to provide services for Rhino Shield on the Hunters' home." (Am. Compl. ¶ 99). And the Subcontract Services Agreement[5] ("Subcontractor Agreement") that Dgebuadze entered into with Tri-State states:

> 8.     Insurance.  Subcontractor covenants and agrees that Subcontractor shall carry adequate insurance related to the work place and the Contracted Services including, but not limited to, workmen's compensation, general liability and property damage.

(Subcontractor Agreement ¶ 8 [ECF No. 39-4]). Accordingly, the Court agrees with Dgebuadze. Plaintiffs have failed to allege sufficient facts that Dgebuadze was a joint venturer in "Rhino Shield" and, as Dgebuadze was not party to the "Rhino Shield" joint venture, Plaintiffs have failed to establish that Dgebuadze: 1) made any express warranties to the Plaintiffs; and/or 2) was in contractual privity with the Plaintiffs. Accordingly, Dgebuadze's Motion to Dismiss Plaintiffs' Magnuson-Moss claim for failure to state a claim is **GRANTED**.

---

[5] Dgebuadze's Subcontractor Agreement is properly before the Court's consideration though Plaintiffs' did not attach it to their Amended Complaint because Plaintiffs expressly refer to and rely on the Subcontractor Agreement in the Amended Complaint. (Am. Compl. ¶ 99).

## 2.    RS Defendants 12(b)(6) Motion

The RS Defendants assert that dismissal of the Plaintiffs' Amended Complaint is warranted because the Plaintiffs have failed to comply Rule 8's requirement that the allegations contain a short and plain statement demonstrating that Plaintiffs are entitled to relief.  (RS Mot. at 12). Further, the RS Defendants assert that "Plaintiffs' Amended Complaint merely refers to 'Defendants' in most claims and cause of action but does not identify the individual Defendant who are part of each particular cause of action, allegation or factual assertion." (*Id.*).  Additionally, the RS Defendants submit that Plaintiffs have failed to plead all necessary elements of the Magnuson-Moss claim. (*Id.* at 12–13).

Neither of the RS Defendants' arguments is persuasive.  First, Plaintiffs' referral to the Defendants collectively as "Defendants" does not violate Rule 8 as Plaintiffs incorporate the allegations previously alleged in the Amended Complaint. (*See* Am. Compl. ¶¶ 187, 195, 203, 212, 217, 231, 237, 245).  Therefore, a complete reading of the Amended Complaint supplies the Defendants with fair notice of the allegations against them.

The RS Defendants' challenge to the adequacy of Plaintiffs' pleading of the third and fourth essential elements of the Magnuson-Moss claim is equally unpersuasive.  The third and fourth elements of a Magnuson-Moss claim are that: "(iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." *Temple*, 133 F. App'x at 268 (citing *Abele*, 11 F. Supp. 2d at 961).  "In determining whether or not a seller is given a reasonable amount of time or a reasonable number of attempts to cure a defect, the Magnuson-Moss Act contemplates that a seller 'will be given at least two chances to remedy an alleged defect.'" *Id.* (quoting *Teerlin*, 2001 WL

641337, at *5); *see also Marchionna v. Ford Motor Co.*, No. 94-274, 1995 WL 476591, at *11 (N.D. Ill. Aug. 10, 1995).

The RS Defendants correctly point out that in the section of Plaintiffs' Amended Complaint specifically addressing the Magnuson-Moss claim, Plaintiffs have not alleged that they gave Defendants adequate time to remedy the alleged breaches. However, a holistic reading of the Amended Complaint demonstrates that Plaintiffs have pleaded this element of their Magnuson-Moss claim. For example, Plaintiffs claim:

> 159. The Hunters addressed their concerns with Rudy Pallone, who acknowledged the problems, but then told them that everything would be fixed and cleaned up. That never happened. The coating was defective because it was not applied at the proper mil thickness, and continues to peel, split crack, blister, and break. The job was a disaster. The Hunters asked them to repair the damage and finish the job. The defendants agreed and *repeatedly* assured the[ Hunters] that they would complete the job and repair the damage, but ultimately never did. The defendants failed and refused to honor various warranties provided to the Hunters.

(Am. Compl. ¶ 159) (emphasis added). Plaintiffs also allege that they met with Pallone on June 7, 2013 and spoke with him about the deficiencies, and apart from needing Williams' authority to pay for the damage caused to the roof, Pallone assured Plaintiffs that Defendants would repair the remaining damage. (*Id.* ¶ 161). Plaintiffs contacted Mr. Andre, an associate of Williams, and spoke of the damage to their home to Mr. Andre who apparently relayed what Plaintiffs told him to Williams. Williams emailed the Plaintiffs on June 12, 2013 assuring them that the damage to their home would be remedied and the job would be completed. (*See* Am. Compl. ¶ 166; *see also* 6/12/2013 Williams Letter). Williams visited the Hunters' home on June 19, 2013, acknowledged the damage, and assured the Hunters that their house would be repaired. (Am. Compl. ¶¶ 169–172). However, these repairs were never made. (*See id.* ¶ 174). On June 27, 2013, "Rhino Shield" mailed the Hunters a letter stating they completed the installation of the Rhino Shield coating. (*Id.* ¶ 175; *see also* 6/27/2013 RS Letter [ECF No. 18-3]). Mr. Hunter emailed Williams on July 19,

2013, and told Williams that the job had not been completed; Williams failed to respond. (Am. Compl. ¶ 176). On July 24, 2013, Mrs. Hunter spoke with Pallone on the telephone who stated that somebody would be out that day to work on the Hunters' home; nobody came on July 24, but "Alex" arrived on July 25, 2013. (*Id.* ¶¶ 178–79). "Alex" worked on the Hunters' home on July 25 and July 26, 2013. The "repairs" he made just caused further damage. (*Id.* ¶¶ 180–81). Finally, the Hunters allege: "The defendants finally tired of trying to correct and repair the extensive damage which had been caused by their original as well as repair work. They said that the job was done and never came back." (*Id.* ¶ 182).

Plaintiffs incorporated all previous allegations in the Amended Complaint in their Magnuson-Moss claim. (Am. Compl. ¶ 217). Accordingly, the Court finds that Plaintiffs have sufficiently pleaded all essential elements of a Magnuson-Moss claim and the RS Defendants' Motion to Dismiss for Failure to State a Claim is **DENIED**.

**V.**

For the reasons stated herein, Dgebuadze's Motion to Dismiss (ECF No. 39) is **GRANTED in part and DENIED in part** and the RS Defendants' Motion to Dismiss (ECF No. 43) is **DENIED**.

**IT IS SO ORDERED.**

9 - 25 - 2019
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**