# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RUTH A. HUNTER,** *et al.***,**

      **Plaintiffs,**

           **Case No. 2:18-cv-1097**
    **v.**          **JUDGE EDMUND A. SARGUS, JR.**
           **Magistrate Judge Elizabeth P. Deavers**

**RHINO SHIELD,** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Rhino Shield, James Williams, Steven Dominique, Tri-State Coating, Inc., AmCoat Industries, Inc., Rudolph Pallone, John Robertson, and AmCoat Technologies, Inc.'s (collectively, "Defendants") Motion for Summary Judgment (Defs.' Mot. Summ. J., ECF No. 189); Plaintiffs Ruth Hunter and Mark Hunter's Four Partial Motions for Summary Judgment (Pls.' First, Second, Third, and Fourth Mots. Summ. J., ECF Nos. 190–193); Plaintiffs' two Motions to Strike. (ECF Nos. 216, 233), and Plaintiffs' Motion for Default Judgment against Defendant Alex Dgebuadze (ECF No. 196).  For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Third Motion for Summary Judgment, **DENIES** Plaintiffs' First, Second, and Fourth Motions for Summary Judgment, **DENIES** Plaintiffs' Motions to Strike, and **DENIES** Plaintiffs' Motion for Default Judgment.

## I. Background

This case arises from a contract between David Hunter and Defendant Tri-State Coating, Inc. to apply "Rhino Shield" ceramic coating to the exterior of the home of Mr. Hunter and his wife, Plaintiff Ruth Hunter.  (David Hunter Dep., Ex. C, ECF No. 159-3.)  David Hunter is now

deceased.  His son, Plaintiff Mark Hunter, brings this action as the executor of his estate together with Ruth Hunter.

**A. Rhino Shield ceramic coating, AmCoat Industries, Inc., and Tri-State Coating, Inc.**

Rhino Shield is a ceramic coating designed for application to the exterior walls of a house. (David Hunter Dep., Ex. B, ECF No. 159-2.)  Advertisements for Rhino Shield indicate the purported benefits of the product:

- "Eliminate frequent repainting"
- "Reduce energy consumption"
- "Prevent mold, mildew, staining"
- "25-year warranty"
- "No cracking, flaking or peeling"
- "Increase resale value"

(*Id.*)  The Rhino Shield coating can be applied to wood, stucco, brick, and block.  (Williams Aff. ¶ 2., ECF No. 217-1.)  Rhino Shield has dealers located throughout the United States.  (David Hunter Dep., Ex. B.)  The product includes an "Adhesive Primer Sealer" and a "Ceramic Finish Coat."  (*Id.*, Ex. C.)

Rhino Shield is a trademarked product name owned by Defendant AmCoat Industries, Inc., a Florida corporation.  (Dominique Dep. 16:16–22.)  Defendant Steven Dominique is the majority owner and CEO of AmCoat Industries.  (*Id.* at 29:8–24.)  AmCoat Industries has an agreement with Defendant Tri-State Coating, Inc., an Indiana corporation, under which AmCoat Industries supplies Rhino Shield to Tri-State and gives Tri-State the exclusive rights to deal Rhino Shield in Indiana and central and southern Ohio.  (Defs. Exs. 18–19, ECF Nos. 226-3–4.)

Tri-State registered with the Ohio Secretary of State on August 26, 2011 to do business in Ohio under the name "Rhino Shield." (Williams Aff. ¶ 3; Certificate of Good Standing, Defs' Ex. 16, ECF No. 217-3.)  Defendant Jim Williams is the owner and president of Tri-State.  (Williams

Dep. 54:4–9, 57:21–23.)  Defendant Rudolph Pallone is a salesperson working for Tri-State as an independent contractor.  (Pallone Dep. 38:10–19.)

### B. Transaction between David Hunter and Tri-State

In the fall of 2012, David Hunter saw a television advertisement for Rhino Shield.  (David Hunter Dep. 17:17–19.)  Hunter was in failing health at the time. The Rhino Shield 25-year product warranty was attractive to him because he wanted the house to look good so that his wife, Ruth, would be able to sell the home if anything happened to him.  (*Id.* at 15:13–20.)  After seeing the television ads for Rhino Shield a few times, Hunter called the 1-800 number listed in the ad.  (*Id.* at 18:9–12.)  Pallone answered the phone and identified himself as "Rhino Shield."  (*Id.* at 19:3–7.)  After David Hunter and Pallone spoke on the phone, Pallone came to the Hunters' home on November 14, 2012.  (*Id.* at 19:10–12.)  Pallone inspected the home, showed David Hunter a sample of concrete siding with the Rhino Shield coating on it, and explained how long it would take to complete the application of Rhino Shield to the home.  (*Id.* at 21:1–16.)  Pallone also left David Hunter with a quote that day.  (*Id.*)  The quote stated that the price would be good for 30 days.  (Pallone Dep. 74:1–13.)

On December 31, 2012, David Hunter called Pallone again about Rhino Shield.  (David Hunter Dep. 23:12–17.)  According to Hunter, Pallone told him that the price from the quote would not go up if he "got in by December 31st."  (*Id.*)  Within the hour, Pallone came to the Hunters' home and brought with him a preprinted agreement to be filled out.  (*Id.* at 25:5–10.)  After going over the price, Hunter decided to go through with the transaction and signed the agreement, but Hunter did not read any part of the contract other than the price.  (*Id.* at 28:5–8, Ex C.)  The "agreed upon" price in the agreement was $11,998.  (*Id.*)  Hunter made a down payment of $1,200 on December 31, 2012.  (*Id.* at 32:5–13.)

The agreement between David Hunter and Tri-State is single piece of paper, filled front and back, with "Rhino Shield by Tri-State Coating, Inc." at the top. (*Id.*, Ex. C.) The front page of the agreement contains the customer information box, the listed services, and the agreed-upon payment structure. (*Id.*) The back page of the agreement contains the terms and conditions. (*Id.*) A cancellation notice at the top reads: "The Customer understands that they have 3 business days to cancel this contract without obligation. **After 3 days the down-payment is non-refundable.**" (*Id.* (bold in original).) The agreement contains a two-year workmanship warranty and indicates that Tri-State will transfer to the customer all of the manufacturer's written warranties. (*Id.*) It contains a warranty disclaimer, an integration clause, and a modification clause. (*Id.*) The agreement consistently refers to "Tri-State Coating" throughout. (*Id.*)

In early May 2013, Tri-State sent a crew of three people out to begin applying Rhino Shield on the Hunters' home. (Pallone Dep. 110:6–17.) The crew sent was run by Defendant Alex Dgebuadze and included Defendant John Robertson. (*Id.*; Williams Dep. 150:4–13.) Dgebuadze and Robertson are subcontractors and are "certified" appliers of Rhino Shield, according to Williams. (Williams Dep. 149:23–25, 191:23–192:9.) On May 10, 2013, after Dgebuadze and his crew applied Rhino Shield to the Hunters' home, Pallone met with David Hunter at the home to collect additional payment. (David Hunter Dep. 35:4–9.) Hunter signed a "completion certificate" and wrote a check to "Rhino Shield" for $9,719, but told Pallone that he was withholding 10% because he was not happy with the job. (*Id.* at 35:24–36:5, Exs. D–E, ECF Nos. 159-5–5.) The "completion certificate" notes in handwriting, "customer holding back 10%." (*Id.*, Ex E.) The certificate also notes underneath the signature lines:

**<u>Tri-State Coating, Inc.</u>**
*Authorized* Rhino Shield *dealer*

(*Id.* (text in original).)

After Hunter signed the completion certificate and withheld 10% on May 10, 2013, Williams claims he called David Hunter three times to talk about Hunter's problem with the job, but Hunter never answered and never returned the call. (Williams 165:2–166:3.) David Hunter disputes this, claiming that Williams "never called, period." (David Hunter Dep. 39:18–24.) Soon after May 10, Pallone went to the Hunters' home and prepared a "punch list" of problems to fix together with the Hunters. (Pallone Dep. 132:7–135:25.) Pallone sent Dgebuadze back out to the Hunters' home to work on the punch list. (*Id.*)

After Dgebuadze worked on the punch list, Mark Hunter (David and Ruth's son) arranged a meeting with Pallone for June 7, 2013 because the "job was not going well" and there was "paint all over the place, on everything, the roof, the concrete, the concrete bricks, windows, everything." (David Hunter Dep. 40:20–42:10.) During the June 7 meeting, Mark Hunter presented Pallone with a "deficiency report" containing pictures of everything the Hunters wanted fixed. (Mark Hunter Aff. ¶¶ 31, ECF No. 190-3; "Deficiency Report," ECF No. 71-7.) The deficiency report showed photos of overspray on the brick wall, roof, yard hose, brick patio, utility meter; cracking paint, damaged plants; areas where primer supposedly was not applied prior to finished coating being applied; pine needles imbedded in the paint; the report also requested funding from Tri-State to test the thickness of the coating. ("Deficiency Report," ECF No. 71-7.")

After the June 7 meeting, the Hunters met with Williams for the first time on June 19, 2013. (David Hunter Dep. at 45:1–46:21.) The Hunters told Williams about damage to a patio umbrella and damage to the roof from overspray; Williams wrote a check to the Hunters to cover the cost of replacement, but the Hunters never cashed the checks. (*Id.*) Williams expressed to the Hunters that the quality of the job was not acceptable and that he was not satisfied. (Mark Hunter Aff. ¶¶ 44–45.) Williams sent Dgebuadze back out to fix problems with the job. (*Id.*) David Hunter

testified that not all the requested repairs were made and that sometimes "they would actually make things worse[.]" (David Hunter Dep. 50:23–24.)  And Mark Hunter testified that subcontractors who came to the home did not make all needed repairs.  (Mark Hunter Aff. ¶¶ 43–45.)  Mark Hunter claims that Williams told him that he would "stay on site until the job was complete and all of the damage was repaired."  (*Id.* ¶ 45.)  However, Mark Hunter claims, "Williams then abruptly left, and we never saw him again. His workers and crews did not show up as promised. The crew foreman . . . Alex Dgebuadze, came to the house a few times, but did not complete the job or repair the damage."  (*Id.*)

According to Pallone, Tri-State took care of all the items on the punch list.  (Pallone Dep. 124:17–22.)  Because the 25-year product warranty does not go into effect until the job is completed, Tri-State provided the Hunters with the manufacturer's 25-year product warranty on June 27, 2013 after Pallone reported that the items on the punch list were satisfied.  (Williams Dep. 115:8–13, 248:5–249:10; Mark Hunter Aff. ¶ 47.)  The date of application on the warranty is June 25, 2013 and is issued to "David Hunter."  (Defs.' Mot., Ex. 7, ECF No. 189-7.)

Jim Williams testified that he has "personally viewed the Hunters' home" and that the "work done by Rhino Shield looks great" aside from "few minor cosmetic issues that would take very little time" to fix.  (Williams Aff. ¶ 6.)  Williams claims that, after Dgebuadze and Pallone finished the punch lists after June 19, they told him that the job was completed, and Williams never heard from the Hunters again.  (Williams Dep. 245:10–248:1.)  Williams claims that the Hunters "have only provided one punch list" to Tri-State and that Tri-State fixed those issues.  (Williams Aff. ¶ 8.)

The Hunters maintain that they have now incurred $126,528.01 in total damages in repairing damage to their home caused by Tri-State's application of Rhino Shield.  (Mark Hunter

Aff. ¶ 69; Pls.' Ex. 5K, ECF No. 190-9.)  Williams claims that the issues of which the Hunters now complain are new issues that they did not allow Tri-State to fix, and that the Hunters have never made a request for warranty work.  (Williams Aff.  ¶ 8.)

### C.  Procedural history

On February 6, 2014, the Hunters filed suit against "Rhino Shield," Tri-State, Jim Williams, and Rudoplh Pallone in the Franklin County Court of Common Pleas, asserting claims for violating the Ohio Consumer Sales Practices Act, misrepresentation, and breach of contract (Dkt. No. 14-cv-1274).  During that case, the court granted summary judgment to Defendants on the Hunters' misrepresentation claims.  (April 29, 2016 Decision and Entry Granting Defendant Tri-State Coating Inc., DBA Rhino Shield's Motion for Partial Summary Judgment Against the Plaintiffs . . . on Their Misrepresentation Claim, Defs.' Ex. 11, ECF No. 189-11.)  The court also granted summary judgment in favor of the Hunters as to Tri-State's liability on some of the alleged violations of the Consumer Sales Practices Act and Home Sales Solicitation Act.  (June 8, 2017 Decision and Entry Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Pls.' Ex. O, ECF No. 192-13.)  But before the Hunters proceeded to trial or a final judgment, they filed a notice of dismissal "without prejudice" as to Rhino Shield, Jim Williams, Rudolph Pallone, and Tri-State.  (Sep. 22, 2017 Notice of Dismissal Without Prejudice, Defs.' Ex. 10, ECF No. 189-10.)  That case remains ongoing following the court's decision to sanction the Hunters and their counsel for conduct during that case.  *See* Franklin Cnty. Ct. Common Pleas Dkt. No. 14-cv-1274.

On September 21, 2018, the Hunters filed the instant action against Williams, Pallone, Dgebuadze, Robertson, Dominique, AmCoat Industries, AmCoat Technologies, Rhino Shield (Indiana address), Rhino Shield (Florida address), and "Rhino Shield Florida" (Compl., ECF No.

1.)  Plaintiffs filed an Amended Complaint on November 8, 2018.  (Am. Compl., ECF No. 18.)
The Amended Complaint asserts claims against all Defendants for: (1) violation of the Ohio
Consumer Sales Practices Act; (2) Negligent and/or Intentional Misrepresentation; (3) Breach of
Contract; (4) violations of the Ohio Home Sales Solicitation Act; (5) Breach of Express and
Implied Warranties and Violations of the Magnuson-Moss Warranty Act; (6) Civil Conspiracy;
(7) Declaratory Judgment that "Defendants are Vicarious Liability [sic] As Agents, Agents by
Estoppel, Apparent Authority, and as a Joint Venture"; and (8) Alter Ego Liability.  (*Id.*)

The Hunters and all Defendants but Defendant Dgebuadze now move for summary
judgment.  Defendant Dgebuadze is in default in this action, and the Hunters have moved for
default judgment against Dgebuadze.  The Court will address the motions for summary judgment
and motions to strike before addressing the Hunters' motion for default judgment.

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to
any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
The Court may therefore grant a motion for summary judgment if the nonmoving party who has
the burden of proof at trial fails to make a showing sufficient to establish the existence of an
element that is essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing
the district court of the basis for its motion and identifying those portions" of the record which
demonstrate "the absence of a genuine issue of material fact." *Id.* at 323.  The burden then shifts
to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for
trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).
"The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in

his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("The requirement that a dispute be 'genuine' means that there must be more than some metaphysical doubt as to the material facts.").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. Analysis

Defendants move for summary judgment as to all Defendants on all claims, with the caveat that Defendants do not move on the issue of liability on the Hunters' Ohio Consumer Sales Practice Act (CSPA) and Home Solicitation Sales Act (HSSA) claims as to the Tri-State Defendants (Tri-State, Williams, Pallone, and Robertson).  (Defs.' Mot. Summ. J. ["Defs.' Mot."].) Defendant Jim Williams moves for summary judgment on all claims based on the doctrine of *res judicata*.  (*Id.*) Defendants Rhino Shield (Indiana address), Rhino Shield (Florida address), and AmCoat Technologies move for summary judgment on all claims.  (*Id.*)  The Hunters move for summary judgment as to all Defendants on their claims for (1) violation of the CSPA, (2) breach of contract, (3) misrepresentation, and (4) breach of warranties/violation of the Magnuson-Moss Warranty Act. (Pls.' First, Second, Third, Fourth Mots. Summ J. ["Pls.' Mots."].)

The Hunters' claims are premised on the theory that the Defendants jointly operate "Rhino Shield" as an enterprise.  (Am Compl. ¶ 238; Pls.' Resp. in Opp'n at 35–36, ECF No. 215.)  As the Court will explain, however, the record provides no factual support for the theory that

Defendants are liable as a joint "Rhino Shield" enterprise. The Hunters are entitled to summary judgment in part against Tri-State for certain violations of the CSPA and HSSA, but Defendants are entitled to summary judgment on the issue of remedies: the Hunters exercised their statutory right to cancel the contract under the HSSA and are entitled to a refund, but they cannot pursue damages. Defendants are entitled to summary judgment on the Hunters' remaining claims.

## A. *Res Judicata* as to Defendant Jim Williams

Defendant Jim Williams moves for summary judgment on all claims based on Ohio's two-dismissal rule and the doctrine of *res judicata*. (Defs.' Mot. at 10.) Williams's motion requires a close examination of the procedure in the predecessor action between these parties in the Franklin County Court of Common Pleas to determine whether the claims the Hunters now pursue against Jim Williams have already been adjudicated on the merits in the Ohio state court action. If so, the claims asserted in this action against Jim Williams are barred under the doctrine of *res judicata*. *See U.S. Bank Natl. Assn. v. Gullotta*, 899 N.E.2d 987, 988 (Ohio 2008). The Court agrees with Williams that the instant claims against him are barred under the doctrine of *res judicata* because, under Ohio law, the Hunters have already twice filed and dismissed claims against Williams arising out of the same transaction.

### 1. The one-year rule and the two-dismissal rule

Ohio Civ. R. 3(A) states that a "civil action is commenced by filing a complaint with the court, if service is obtained within one year from such filing upon a named defendant." Ohio Civ. R. 3. When a plaintiff "files an instruction for a clerk to attempt service of a complaint that was filed more than a year prior, the instruction, by operation of law, is a notice of dismissal of the claims[.]" *Sisk & Assoc., Inc. v. Commt. to Elect Timothy Grendell*, 917 N.E.2d 271, syllabus

(Ohio 2009). Furthermore, a voluntary "notice of dismissal operates as an adjudication upon the merits of any claim that the plaintiff has once dismissed in any court." Ohio Civ. R. 41(A).

Here, the Hunters originally filed a complaint in state court against Williams on February 6, 2014. Franklin Cnty. Ct. Common Pleas Dkt. No. 14-cv-1274. According to Williams, the Hunters did not serve Williams with the original complaint. (Lackey Aff. ¶ 4, ECF No. 226-11.) The Hunters filed an amended complaint on September 4, 2014. (Pls.' Ex. J, ECF No. 215-19.) That action was stayed on March 10, 2015 until November 10, 2015. (*Id.* ¶¶ 5–6.) The Hunters subsequently instructed the clerk to serve Williams with the amended complaint on April 2, 2016. (Defs.' Ex. 26, ECF No. 226-10.) The Hunters claim that Jim Williams signed for receipt of service on February 19, 2014, but it appears that this signature was on behalf of Tri-State, and not Williams personally. (Pls.' Ex. F, ECF No. 215-15.) The Hunters have not presented evidence that Jim Williams was served personally until after the April 2, 2016 instruction to the clerk. Furthermore, even though Jim Williams was no doubt aware of the case in his capacity as president of Tri-State, "inaction upon the part of a defendant who is not served with process, even though he might be aware of the filing of the action, does not dispense with the necessity of service . . . [t]he rules clearly declare that an action is commenced when service is perfected." *Gliozzo v. Univ. Urologists of Cleveland, Inc.*, 870 N.E.2d 714, 718 (Ohio 2007).

The Hunters did not obtain service over Williams "within one year from" filing the February 2014 complaint against Williams as "a named defendant" (even subtracting the time during which the action was stayed from March 10, 2015 until November 10, 2015). Ohio Civ. R. 3(A). A complaint was filed against Williams on February 6, 2014, Williams was not served with that complaint, and the Hunters instructed the clerk to serve Williams with an amended complaint in the same action on April 2, 2016. Thus, the Hunters' instruction on April 2, 2016 to serve

11

Williams operated as a notice of dismissal and a re-filing of the action against Williams. *Sisk & Assoc.*, 917 N.E.2d at 271, syllabus. And because a "notice of dismissal operates as an adjudication upon the merits of any claim that the plaintiff has once dismissed in any court[,]" the Hunters' voluntary dismissal of Jim Williams on September 22, 2017 operated as an adjudication upon the merits of the claims in that action. Ohio Civ. R. 41(A).

### 2. *Res judicata* (claim preclusion)

Under the doctrine of *res judicata*, a "valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Twp.*, 653 N.E.2d 226, 229 (Ohio 1995) (citing 1 Restatement of the Law 2d, Judgments §§ 24–25 (1982)).[1]  The claims in this action against Williams arise from the same transaction with the Hunters that was the subject of the preceding state court action. *See* Franklin Cnty. Ct. of Common Pleas Dkt. No. 14-cv-1274. Because the second notice of dismissal of the state court action operated as an adjudication on the merits against Williams, this action against Williams arising out of the same transaction is barred under the doctrine of *res judicata*. The Court therefore grants Williams's motion for summary judgment on all claims.

### B. Ohio Consumer Sales Practices Act and Home Solicitation Sales Act

The Hunters move for summary judgment on their claims for violation of the CSPA (which include claims for violation of the HSSA). (Pls.' Third Mot.)  Defendants move for summary judgment on (1) liability as to AmCoat Industries and Steven Dominique and (2) on the issue of

---

[1] "The full faith and credit statute, 28 U.S.C. § 1738, requires a federal court to accord a state court judgment the same preclusive effect that the judgment would have in a state court. When a federal court is asked to give preclusive effect to a state court judgment, the federal court must apply the law of the state in which the prior judgment was rendered in determining whether and to what extent the prior judgment should be given preclusive effect in a federal action." *In re Fordu*, 201 F.3d 693, 703 (6th Cir. 1999) (internal citations omitted).

the Hunters' remedy for the other Defendants' alleged violations of the CSPA and HSSA. Thus, the Court will first address whether Defendants are liable under the CSPA and HSSA and then will address Defendants' motion as to the Hunters' remedy under the CSPA and HSSA.

**1. Liability under the CSPA and HSSA as to the Tri-State Defendants**

The CSPA, Ohio Revised Code § 1345.02, *et seq.*, protects consumers from "deceptive or unconscionable sales practices." *Charvat v. Farmers Ins. Columbus, Inc.*, 897 N.E.2d 167, 178 (Ohio Ct. App. 2008) (citation omitted). The statute "is intended to give protection to consumers from unscrupulous suppliers of goods or services in a more efficient, expedient, and affordable manner than would be available in a common law tort or contract action." *Id.* (citation omitted). The purpose of the statute is remedial and must be "liberally construed in favor of consumers." *Id.* (citation omitted). Included within the Ohio Revised Code chapter on consumer sales practices is the HSSA, which applies to "a sale of consumer goods or services in which the seller or a person acting for the seller engages in a personal solicitation of the sale at a residence of the buyer." *Garber v. STS Concrete Co.*, 991 N.E.2d 1225, 1231 (Ohio Ct. App. 2013). Defendants do not dispute that the HSSA applies to the transaction between David Hunter and Tri-State.

In the state court action between the Hunters and these same Defendants, the state court granted summary judgment in favor of the Hunters as to Tri-State's liability on some of the exact same violations of the CSPA and HSSA alleged in this case. (June 8, 2017 Decision and Entry Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Pls.' Ex. O, ECF No. 192-13.) However, the Hunters dismissed Tri-State, Williams, and Pallone without prejudice from that case before trial occurred on the issue of remedies or liability on the remaining disputed CPSA or HSSA violations. (Sep. 22, 2017 Notice of Dismissal Without Prejudice, Defs.'

13

Ex. 10, ECF No. 189-10.)  Neither party asserts that the state court decision is preclusive, but the court's opinion provides a helpful guide for analyzing the Hunters' claims.

The Hunters submit a list of 45 alleged violations of the CSPA and HSSA, but many of them are duplicative.  (Pls.' Third Mot. 13–22.)  Out of the 45 alleged violations, the Hunters are entitled to summary judgment against Tri-State as to three of the alleged violations.  Defendants AmCoat Industries and Steven Dominique are entitled to summary judgment because the Hunters point to no evidence that those Defendants committed any CSPA or HSSA violations.  However, Defendants are entitled to summary judgment on the issue of the Hunters' remedy.  The Hunters elected to cancel the contract under the HSSA; thus, they are entitled to a refund of all payments made under the contract and are not entitled to pursue damages under the CSPA.

### a.  Tri-State violations of the CSPA and HSSA

The state court concluded that Tri-State committed several violations of the CSPA and HSSA.  (*Id.*)  The Hunters re-assert those alleged violations here.  The Court agrees with the state court; there are no genuine factual disputes that Tri-State violated the CSPA and HSSA.

**Tri-State's failure to comply with the three-day cancellation notice requirement**. "Under the HSSA, a home solicitation sale must include a written agreement that contains a statement of the buyer's right to cancel the contract until midnight of the third business day after the day on which the buyer signs the contract."  *Garber*, 991 N.E.2d at 1231.  Failure to comply with the three-day cancellation notice requirement under the HSSA constitutes a violation under the CSPA.  *Id.* at 1232 (citing Ohio Rev. Code § 1345.02). The cancellation notice must appear in bold by the signature line and state: "You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation for an explanation of this right."  Ohio Rev. Code § 1345.23(B)(1).  The notice of

cancellation must also be accompanied by an attached form providing notice of a right to cancellation. *Id.* § 1345.21(B)(2).

Here, it is undisputed that Tri-State provided a notice of cancellation in the contract, but that the notice did not comply with the requirements of § 1345.23(B)(1) or (2). (David Hunter Dep., Ex. C; Pallone Dep. 98:2–8.) It does not contain the required language and does not appear by the signature line; the signature line appears on front of the page, while the notice of cancellation is located on the back of the page. (David Hunter Dep., Ex. C.) Tri-State also did not provide the required attached cancellation form. Thus, the Hunters are entitled to summary judgment on their claim that Tri-State violated the HSSA and CSPA for failing to comply with the HSSA's cancellation notice requirements. *See Garber*, 991 N.E.2d at 1231.

**Tri-State's failure to inform consumer of the use of subcontractors.** Ohio courts have determined that a seller failing to inform a consumer that subcontractors will be employed to perform services constitutes an unfair and deceptive act in violation of the CSPA. *See Teeters Constr. v. Dort*, 869 N.E.2d 756, 770 (Ohio Mun. Ct. 2006). Here, Tri-State did not inform the Hunters that it would be utilizing subcontractors to apply Rhino Shield to the Hunters' home. (Defs.' Answer to Interrogatory No. 2, Pls.' Ex. N at 29, ECF No. 192-12.) Thus, Tri-State violated the CSPA. *Teeters Constr.*, 869 N.E.2d at 770.

**Required arbitration in Indiana.** Ohio courts have also determined that including arbitration clauses in consumer transactions that require arbitration in a county "other than where the consumer resides or in which the contract was signed" violates the CSPA prohibition on unconscionable acts, Ohio Rev. Code § 1345.03(B)(5) by "knowingly taking advantage of the inability of consumers to protect their interests." *Beckman v. Squire*, No. 96CV117632, 1999 WL 123605, at *4 (Ohio Com. Pl. Jan. 12, 1999) (collecting cases). Here, the contract contained an

arbitration provision requiring arbitration in Marion County, Indiana. Accordingly, just as the state court concluded in the predecessor action between the Hunters and Defendants, Tri-State violated the CSPA by including this arbitration provision in the contract.

### b. AmCoat Industries and Dominique's liability under the CSPA

Defendants AmCoat Industries and Steven Dominique move for summary judgment on the Hunters' CSPA and HSSA claims, arguing that there is no evidence they engaged in a "consumer transaction" with the Hunters as required for the CSPA to apply. *See* Ohio Rev. Code § 1345.01. The Court agrees. The Hunters do not point to evidence that AmCoat Industries or Steven Dominique engaged in a consumer transaction with the Hunters. Thus, the Court grants AmCoat Industries's and Dominique's motion.

### 2. Remedies under the CSPA and HSSA

Defendants move for summary judgment on grounds that the Hunters elected to cancel the contract under the HSSA as a matter of law and therefore cannot maintain an action for damages under the CSPA. The Hunters dispute that they cancelled the contract and move for summary judgment on the issue of damages for Defendants' CSPA and HSSA violations. (Pls.' Third Mot. at 22; Pls.' Resp. in Opp'n at 52–53.)

When a buyer proves a violation of the CSPA, the plaintiff may either "rescind the transaction" or "recover the consumer's actual economic damages plus an amount not exceeding five thousand dollars in non-economic damages." Ohio Rev. Code § 1345.09(A). But when the seller fails to comply with the HSSA three-day cancellation notice requirement, a third remedy becomes available to the plaintiff: the plaintiff may "cancel the contract" under § 1345.23 of the HSSA. *Garber*, 991 N.E.2d at 1233. Under § 1345.23(C), until "the seller has complied with" the statute's cancellation notice requirements, "the buyer may cancel the home solicitation sale by

delivering to the seller by certified mail, return receipt requested, personal or manual delivery, facsimile transmission, or electronic mail, written notice to the seller of the buyer's intention to cancel." Ohio Rev. Code § 1345.23(C). Cancellation of the contract entitles the buyer to a refund of any payments made under the contract. *Garber*, 991 N.E.2d at 1233 (citing § 1345.23(C)).

The CSPA remedies and the HSSA cancellation remedy are mutually exclusive—a plaintiff cannot both cancel the contract under the HSSA and maintain an action under the CSPA for damages or rescission. *Id.*; *see also*, *e.g.*, *Smith v. Sack*, 60 N.E.3d 667, 673 (Ohio Ct. App. 2016) ("Because Mr. Smith canceled the contracts, he elected to proceed under the HSSA. As such, his remedy was limited to a refund and he was not entitled to damages under the CSPA. Since Mr. Smith could not recover damages, he was not required to prove them."); *Kamposek v. Johnson*, 2005-Ohio-344, ¶ 27, 2005 WL 238152, *5 (Ohio Ct. App. Jan. 28, 2005) ("While the cancellation of a contract under the HSSA is similar to the rescission of a contract, they are distinct concepts."). Once a plaintiff elects to cancel the contract under the HSSA, the plaintiff is no longer entitled to pursue recovery under the CSPA. *White v. Allstate Ins. Co.*, 2009-Ohio-5829, ¶ 16, 2009 WL 3649739 (Ohio Ct. App. Nov. 5, 2009) (stating that the plaintiff "cannot cancel the contract in one context and still claim a right to enforce it in another context.").

Defendants argue that the Hunters cancelled the contract on June 9, 2017 following the state court's decision granting summary judgment in part in favor of the Hunters on their CSPA and HSSA claims against Tri-State. (Defs.' Mot. at 8; Pls.' Ex. B, ECF No. 215-11.) After the state court determined that Defendants were liable for violating the CSPA—but left the issue of damages for trial—the Hunters' counsel sent an email to Defendants' counsel enquiring about Defendants' willingness to discuss settlement. (Pls.' Ex. B., ECF No 215-11.) After Defendants'

counsel emailed back declining to make the Hunters an offer, the Hunters' counsel wrote an email

back stating:

> "I appreciate the prompt response.  We will likely continue to agree to disagree on
> the merits and applicable law, but you may want to consider the following.
>
> The Hunters hereby cancel the contract.  [They have previously done so, but we
> reiterate the cancellation again so there is no misunderstanding.]
>
> When there is a failure to provide the right to cancel in accord with Ohio law, then a
> supplier proceeds at his own risk with the service.  Your clients proceeded at their
> own risk when admittedly failing to provide the statutory right to cancel . . . The court
> has granted summary judgment on this issue in today's ruling . . . ."

(*Id.* (brackets in original).)  The email goes on to discuss the issue of damages under the CSPA

and informs Defendants' counsel that the Hunters' will need an increased offer to settle the case.

(*Id.*)

Defendants argue that the Hunters' counsel's email cancelled the contract; the Hunters

respond that the email is inadmissible and was not intended as an election of remedies.  Before

considering whether the Hunters cancelled the contract, the Court must first address whether the

email that Defendants allege cancelled the contract is admissible.

### a.  Admissibility of the email

The Hunters object to the admissibility of the email under Federal Rules of Evidence 408

and 802 (the rule against hearsay).  (Pls.' Resp. in Opp'n at 52–53.)[2]

Rule 408 does not render the email inadmissible.  Rule 408 prohibits the admissibility of

compromise offers and statements made during settlement negotiations to "prove or disprove the

validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a

---

[2] The Hunters also object to the emails on grounds of completeness and authentication.  Defendants attached
only a single email to their motion for summary judgment.  However, the Hunters helpfully attached the full thread of
emails to their response in opposition to provide context, which moots their completeness objection and concedes that
there is no genuine dispute as to the authenticity of the emails.  (*Id.*, Ex. B, ECF No. 215-11.)

contradiction[.]"  Fed. R. Evid. 408(a).  But the rule allows courts to admit that evidence "for another purpose[.]" *Id.* 408(b).  Here, the Hunters' counsel's email is admissible for "another purpose"—proof that the Hunters exercised their right to cancel the contract under the HSSA. Defendants do not seek to admit the email to "disprove the validity or amount of a claim" against them.  *Id.* 408(a).  Thus, even though the Hunters' counsel sent the email to Defendants' counsel in the context of discussing settlement, Rule 408 does not render the email inadmissible.

The statement is also not hearsay.  Hearsay is an out of court statement used to prove the truth of the matter asserted.  Fed. R. Evid. 801.  Statements "that constitute verbal acts—like the words of a contract—are not hearsay." *Kentucky Petroleum Operating Ltd. v. Golden*, No. CIV. 12-164-ART, 2015 WL 927358, at *2 (E.D. Ky. Mar. 4, 2015).  Here, Defendants attempt to prove that the Hunters' counsel's statement cancelling the contract was a "verbal act." *See Preferred Properties, Inc. v. Indian River Ests., Inc.*, 276 F.3d 790, 799 (6th Cir. 2002) ("The verbal acts doctrine applies where legal consequences flow from the fact that words were said, e.g. the words of offer and acceptance which create a contract.") (internal quotations and citation omitted).  The statement is therefore not hearsay and is admissible.

### b.  Whether the email cancelled the contract under the HSSA

Having concluded that the email is admissible, Court also concludes that the Hunters' counsel's statement cancelled the contract under the HSSA as a matter of law. Until the buyer complies with the statute's technical cancellation notice requirements, the buyer's right to cancel does not expire—even after litigation has commenced. *Garber*, 991 N.E.2d at 1232 (citing § 1345.23(C)); *Kamposek*, 2005 WL 238152, at *4.  It is undisputed that Tri-State never complied with the HSSA's cancellation notice requirements.  Thus, the Hunters retained the statutory right

to cancel the contract at any time by "delivering to the seller by . . . electronic mail, written notice to the seller of the buyer's intention to cancel." Ohio Rev. Code § 1345.23(C).

The Hunters' counsel's email satisfied § 1345.23(C)'s requirements to cancel. It was a written notice, sent by electronic mail, to the seller's attorney of record notifying the seller of the buyer's "intention to cancel." *Id.* In contract law, "courts properly consider only objective manifestations of intent." *Nilavar v. Osborn*, 711 N.E.2d 726, 733 (Ohio Ct. App. 1998), *modified on reconsideration* (May 12, 1998); *see also Lucy v. Zehmer*, 84 S.E.2d 516, 522 (Va. 1954) (In this canonical contract-law case, the court explained that "a person cannot set up that he was merely jesting when his conduct and words would warrant a reasonable person in believing that he intended a real agreement."). Here, the objective manifestation of intent by the Hunters could not be any clearer: "**The Hunters hereby cancel the contract.  [They have previously done so, but we reiterate the cancellation again so there is no misunderstanding.]**" (Pls.' Ex. B., ECF No 215-11 (brackets in original, emphasis added).) Because the Hunters elected to cancel the contract under the HSSA, they are entitled to a full refund of all payments made under the contract but cannot pursue damages under the CSPA. *See Sack*, 60 N.E.3d at 673; *White*, 2009 WL 3649739 at *4.

The Hunters argue that their statement was "arguably perhaps a poor choice of words when taken out of context." (Pls.' Resp. in Opp'n 53.) If anything, the context of the Hunters' email bolsters the objective interpretation of the Hunters' statement that they "hereby cancel the contract" as, in fact, a cancellation of the contract. The Hunters' counsel sent the email after trying to initiate settlement discussions following the state court's grant of summary judgment in favor of the Hunters on Tri-State's violation of the HSSA three-day cancellation notice requirement along with the other CSPA violations discussed above. (June 8, 2017 Decision and Entry Granting

in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, Pls.' Ex. O, ECF No. 192-13.)  The state court left the issue of damages for trial—thus, when the decision was rendered, both the CSPA remedies and the HSSA cancellation remedy remained on the table for the Hunters.

One day after the state court's decision, in notifying Defendants' counsel that the Hunters were cancelling the contract, the Hunters stated, immediately following the statement of cancellation, that: "Your clients proceeded at their own risk when admittedly failing to provide the statutory right to cancel." (Pls.' Ex. B., ECF No 215-11.)  Thus, the Hunters' counsel made clear that the statement cancelling the contract was pursuant to the Hunters' statutory right to cancel the contract under the HSSA.  (*Id.*)  The latter half of the email goes on to discuss the CSPA violations the state court analyzed and the Hunters' expectations for damages at trial under the CSPA.  It appears that the Hunters' counsel sought to both cancel the contract under the HSSA and continue to pursue damages for violations of the CSPA.  That the Hunters' counsel may have mistakenly believed that cancelling the contract under the HSSA would not preclude recovering damages under the CSPA does not negate the clear objective intent to cancel the contract under the HSSA's statutory right to cancel. Even viewing this email in the light most favorable to the Hunters, no reasonable factfinder could conclude that the Hunters did not manifest an objective intent to cancel the contract when stating, "The Hunters hereby cancel the contract.  [They have previously done so, but we reiterate the cancellation again so there is no misunderstanding.]" (Pls.' Ex. B., ECF No 215-11.)

The Hunters' cancellation became effective on June 9, 2017 when the written notice of intent to cancel was delivered to Tri-State's counsel of record via email. Ohio Rev. Code §

1345.23(C).[3]  Once the cancellation became effective under the HSSA, the Hunters no longer retained the right to proceed under §1345.09 of the CSPA.  Their remedy now is limited to a refund of all payments made under the contract.  *Sack*, 60 N.E.3d at 673; *see also Garber*, 991 N.E.2d at 1233 ("It is clear from the record that the contract was cancelled in this case, as evidenced by Garber's notice of cancellation received by appellants on May 6, 2009.").

Accordingly, the Court grants the Hunters' motion for summary judgment in part on the issue of liability under the HSSA, and grants Defendants motion for summary judgment on the issue of remedies.[4]  Tri-State must refund all payments made under the contract to the Hunters. Because the Hunters elected to proceed under the § 1345.23 of the HSSA, they are not entitled to recover damages or attorney's fees under § 1345.09 of the CSPA.[5]

---

[3] It's important to note the distinction that the Hunters retained the right to cancel under § 1345.23(C) and not § 1345.22(A).  Under § 1345.22(A), "the buyer has the right to cancel a home solicitation sale until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase.  Cancellation is evidenced by the buyer giving written notice of cancellation to the seller at the seller's address, electronic mail address, or facsimile number *stated in the agreement or offer to purchase*." *Id.* (emphasis added).  One Ohio appellate court has strictly interpreted the requirements of § 1345.22(A), holding (in the context of paper mail) that service at the address of a seller's legal counsel of a responsive pleading containing a notice of cancellation did not satisfy the requirements of § 1345.22(A) because the seller's legal counsel's address was not the address "stated in the agreement[.]" *Camardo v. Reeder*, 2002-Ohio-3099, 2002 WL 1349083, at *5 (Ohio Ct. App. June 20, 2002).

*Camardo*'s reasoning does not apply here.  The Hunters retained the right to cancel under § 1345.23(C)— *Camardo* interpreted a prior version of § 1345.22(A).  Unlike § 1345.22(A), § 1345.23(C) only requires the buyer to deliver "written notice to the seller of the buyer's intention to cancel"—that section contains no requirement that the delivery be sent to the address stated in the agreement. *Id.* § 1345.23(C).  Implicit in § 1345.23(C) is that the stricter cancellation requirements of § 1345.22(A) only pertain to the buyer's three-day right to cancel *once the seller has complied with the notice requirements of § 1345.23(A) and (B)*. *Id.*  ("The three-day period prescribed by section 1345.22 of the Revised Code begins to run from the time the seller complies with divisions (A) and (B) of this section.").  Indeed, § 1345.23(A) requires the written agreement to contain the address of a seller.  If a seller does not comply with § 1345.23(A) by including its address, how could a buyer exercise the right to cancel by sending the notice of cancellation to the seller's address "stated in the agreement"?  That is why the less strict requirements of § 1345.23(C) apply until the seller complies with 1345.23(A) and (B).  Here, Tri-State never complied with both § 1345.23(A) and (B), and it is undisputed that written notice was delivered to Tri-State of the Hunters' intention to cancel under the HSSA.  § 1345.23(C).

[4] Because the Hunters' cancelled the contract under the HSSA, the Court need not analyze the remaining alleged CSPA violations out of the 45 listed in the Hunters' motion.  (Pls.' Third Mot. 13–22)

[5] The HSSA specifies that, in sales "involving the sale and installation of home security and automation systems," the seller must return the property to its original condition after cancellation.  Ohio Rev. Code § 1345.22 (C)(2).  The HSSA does not contain that requirement for other types sales under the HSSA, so Tri-State is not required to restore the property to its original condition.

## C. Breach of Contract

The parties each move for summary judgment on the Hunters' claims for breach of contract. To establish a breach of contract, the plaintiff must prove (1) that there was a binding agreement; (2) that the nonbreaching party performed; (3) that the other party failed to perform its contractual obligations; and (4) that the nonbreaching party suffered damages. *Carbone v. Nueva Constr. Grp.*, L.L.C., 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) (citing *Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996)).

The Hunters claim that Tri-State breached the contract by: (1) failing to apply the Rhino Shield coating 8-10 times thicker than standard latex paint; (2) failing to apply primer to the home; and (3) failing to perform services in a workmanlike manner. [6] (Pls.' First Mot. at 14–17.) Defendants respond that there are no genuine issues of fact and that they is entitled to summary judgment because: (1) the contract contains no term about the thickness of the coating; (2) that it is undisputed that primer was applied; and (3) that Defendants remedied any minor issues with the initial paint application on the Hunters' home and therefore did not fail to perform services in a workmanlike manner. (Defs.' Resp. in Opp'n at 12–13.)

Defendants are entitled to summary judgment on the Hunters' breach of contract claims. The Hunters have exercised their statutory right to cancel the contract under the HSSA. Once a buyer cancels a contract under the HSSA, the provisions of that contract are no longer enforceable. *See, e.g.*, *Wisniewski v. Marek Builders, Inc.*, 87 N.E.3d 696, 700 (Ohio Ct. App. 2017) (holding that the buyer cancelled the contract under the § 1345.23(C) of the HSSA and therefore the seller

---

[6] The Hunters also argue that the written agreement between Tri-State and David Hunter is not a valid contract because it is not signed by a representative from Tri-State. (Pls.' First Mot. at 13.) But "[s]ignature spaces in the form contract do not in and of themselves require that the signatures of the parties are a condition precedent to the agreement's enforceability." *Richard A. Berjian, D. O., Inc. v. Ohio Bell Tel. Co.*, 375 N.E.2d 410, 413 (Ohio 1978). The question is whether the parties intended to be bound by the agreement. *Id.* Here, there is no evidence to support an inference that the parties did not intend to be bound by the agreement.

could not enforce the arbitration provision of the contract). The Hunters exercised their right to cancel the contract and are entitled to a refund under the HSSA. But they cannot maintain an action on a contract they already cancelled under a statutory right. Thus, the Court grants Defendants' motion for summary judgment and denies the Hunters' motion.

### D. Misrepresentation

Next, both sides move for summary judgment on the Hunters' claims for "negligent and/or intentional misrepresentation." (Pls.' Fourth Mot.; Defs.' Mot at 14.) The Hunters claim that Defendants committed common law misrepresentation by allegedly misrepresenting that Rhino Shield coating is "8-10 times thicker than standard latex paint"; that Tri-State would apply primer to the Hunters' home; that Tri-State would perform services in a workmanlike manner; and that Defendants misled David Hunter about the 25-year product warranty. (Pls.' Fourth Mot.) In other words, the Hunters' misrepresentation claim is based on same allegations that form the basis for the Hunters' breach of contract and breach of warranty claims.

Defendants respond to the Hunters' arguments by pointing to a state court decision granting summary judgment in favor of Tri-State on this same claim on April 29, 2016. (Defs.' Ex. 11, ECF No. 189-11.)[7] As the Franklin County Court of Common Pleas explained in that decision, "the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996). Here, the Hunters recast their breach of contract and breach of warranty claims as a claim for intentional or negligent misrepresentation. Because the Hunters' tort claims for

---

[7] Notably, Defendants do not argue that the state court decision precludes the Hunters from re-raising this claim under a *res judicata* or collateral estoppel theory (perhaps because the Hunters dismissed the case against Tri-State without prejudice before a final judgment was entered in that case). (Sep. 22, 2017 Notice of Dismissal Without Prejudice, Defs.' Ex. 10, ECF No. 189-10.) Thus, the Court does not consider whether either of those doctrines apply. It makes no difference in any event because the Court agrees with the state court's reasoning and grants summary judgment to Defendants for the same reasons as the state court did five years ago. (*See* Defs.' Ex. 11.) The Hunters do not acknowledge the state court decision in their motion.

misrepresentation are "based upon the same actions as those upon which" their breach of contract claims are based, the court grants Defendants' motion for summary judgment on the Hunters' misrepresentation claims and denies the Hunters' motion. *Textron Fin. Corp.*, 684 N.E.2d at 1270.

## E. Breach of Warranties and Magnuson-Moss Warranty Act Claims

The Hunters claim that Defendants breached express and implied warranties and violated the Magnuson-Moss Warranty Act. (Pls.' Second Mot. at 1.) The Hunters and Defendants have filed cross motions for summary judgment on these claims.

The Magnuson-Moss Warranty Act "sets forth guidelines, procedures and requirements for warranties, written or implied, on consumer products." *Temple v. Fleetwood Enterprises, Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005) (citing 15 U.S.C. §§ 2301–2312)). The success of a claim under the Magnuson-Moss Warranty Act ultimately depends on a "sustainable claim for breach of warranty." *Id.* (citing *Labonte v. Ford Motor Co.*, No. 74855, 1999 WL 809808, at *7 (Ohio Ct. App. Oct. 7, 1999)). Thus, "if there exists no actionable warranty claim, there can be no violation of the Magnuson–Moss Act." *Id.*

To succeed on a "claim for breach of warranty and/or violation of the Magnuson-Moss Act, a plaintiff must demonstrate that (i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." *Id.* (citing *Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955, 961 (N.D. Ohio 1997)); *Lawhorn v. Joseph Toyota, Inc.*, 750 N.E.2d 610, 612 (2001) ("The Act does not require that a warranty be provided, it merely requires that if a warranty is extended, [the warrantor] must comply with its terms.").

25

The Hunters claim that Defendants made various oral express warranties in addition to written warranties in the contract between David Hunter and Tri-State. (Pls.' Second Mot. at 7–8, 14–21.) Defendants acknowledge that the written agreement contained a two-year workmanship warranty and that Tri-State provided David Hunter a written 25-year product warranty; Defendants dispute that they made any additional express or implied warranties to the Hunters.

### 1. Express written warranties

The Court starts with the two express written warranties that Defendants concede are applicable. It is undisputed that Tri-State provided the Hunters with a two-year workmanship warranty in the contract and a written 25-year product warranty through AmCoat Industries.

### a. The two-year workmanship warranty

The contract between Tri-State and the Hunters contains the following warranty: "Tri-State Coating warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period." (David Hunter Dep., Ex. C.) As the warranty itself makes clear, Tri-State is the sole warrantor of the workmanship warranty. (*Id.*)

Defendants argue that they are entitled to summary judgment on the Hunters' claim as to the two-year workmanship warranty because this warranty is not subject to the Magnuson-Moss Act. (Defs.' Mot. at 12.) The Hunters' motion and their response in opposition to Defendants' motion focus mostly on the 25-year product warranty and other alleged warranties. (Pls.' Second Mot. at 15–20; Pls.' Resp. in Opp'n at 57–59.)

Defendants are correct that the two-year workmanship warranty is not subject to Magnuson-Moss. Under the federal regulations regarding the Magnuson-Moss Warranty Act, "[w]arranties on replacement parts and components used to repair consumer products are covered;

26

warranties on services are not covered. Therefore, warranties which apply solely to a repairer's workmanship in performing repairs are not subject to the Act." 16 C.F.R. § 700.1(h).

Furthermore, for the same reasons the Hunters' breach of contract claims fail as a matter of law, the Hunters' claim for breach of the two-year workmanship warranty also fails as a matter of law. Tri-State made the express two-year workmanship warranty in the written contract between David Hunter and Tri-State. (David Hunter Dep., Ex C.) The Hunters exercised their statutory right to cancel that contract under the HSSA. Thus, the contractual warranty is no longer enforceable. *See Wisniewski*, 87 N.E.3d at 700; *see also Norcold, Inc. v. Gateway Supply Co.*, 798 N.E.2d 618, 624 (Ohio Ct. App. 2003) ("Express warranties are as much a part of the contract as any other part[.]") (citation and internal quotations omitted).

### b. The 25-year product warranty

Tri-State provided the Hunters with the manufacturer's 25-year product warranty on June 27, 2013 after Pallone reported that the items on the punch list were satisfied. (Williams Dep. 115:8–13, 248:5–249:10; Mark Hunter Aff. ¶ 47.) The date of application on the warranty is June 25, 2013. (Defs.' Mot., Ex. 7, ECF No. 189-7.) The warrantors are Defendants Tri-State and AmCoat Industries (the manufacturer). (*Id.*; Williams Dep. 114:9–11.)

The manufacturer's 25-year product warranty, though part of the transaction between David Hunter and Tri-State, was not part of the contract between David Hunter and Tri-State. (*See* David Hunter Dep., Ex. C.) It is unclear whether the Hunters' cancellation of the contract under the HSSA also rendered the manufacturer's warranty unenforceable. Nonetheless, even assuming that the Hunters can still enforce the 25-year product warranty, Defendants are entitled to summary judgment because it is undisputed that the Hunters did not provide either Tri-State or AmCoat Industries a reasonable opportunity to cure any defects under the warranty.

27

The 25-year product warranty provides:

> "The material making up the Rhino Shield Ceramic Coat Permanent Coating System is warranted for twenty-five (25) years against chipping, flaking, or peeling. The manufacturer of Rhino Shield Ceramic Coat Material Warrants that at any time up to twenty-five (25) years after the date of application, it will furnish, without cost to the customer, sufficient Coating Material for the replacement of any Rhino Shield Ceramic Coat that has shown inherent defects in the basic Material."

(*Id.*) It also provides a condition for invoking the warranty: "Upon written notice from buyer during warranty period, Tri-State Coatings, Inc. warrants that it will provide replacement product for valid warranty claims for a period of up to twenty-five (25) years after the date of application." (*Id.*) The warranty is "valid only when the Rhino Shield Ceramic Coat Material is applied by the Manufacturer's approved applicators, and in accordance with the Manufacturer's approved methods." (*Id.*)

Defendants argue that they did not breach the warranty because the Hunters never provided "written notice" of a claim under the 25-year warranty. Plaintiffs respond that Mark Hunter prepared a "deficiency report" and submitted that report to Pallone at the June 7 meeting. (Pls.' Resp. in Opp'n at 58–59; Mark Hunter Aff. ¶ 31.)

Defendants' argument is well taken. There is no evidence that the Hunters provided written notice—or any notice—to either Tri-State or AmCoat Industries that it was making a claim under the 25-year product warranty after Tri-State and AmCoat issued that warranty on June 25, 2013. Mark Hunter provided Tri-State a "deficiency report," but report overwhelmingly concerned problems with Tri-State's workmanship in applying Rhino Shield to the Hunters' home. ("Deficiency Report," ECF No. 71-7.) It does not mention the 25-year product warranty. And the report was provided to Tri-State before the 25-year warranty was issued following Williams's belief that the job was finished. Thus, there can be no genuine dispute that the warrantors—Tri-State and AmCoat Industries—were "not given reasonable opportunity to cure any defects[.]"

28

*Temple*, 133 F. App'x at 268.  The Hunters' claims for breach of the 25-year warranty and for violation of Magnuson-Moss therefore fails as a matter of law, and Defendants are entitled to summary judgment.

### 2.  Other alleged express and implied warranties

The Hunters claim that Defendants made—and breached—a number of other express "written and oral" warranties.  (Pls.' Second Mot. at 14–20.)  The Hunters also claim that Defendants breached the implied warranties of merchantability and fitness for a particular purpose.  (*Id.* at 20.)  Before analyzing the Hunters' arguments, the Court must first determine whether the UCC or common law applies to the transaction between David Hunter and Tri-State.

### a.  UCC or common law

The Hunters contend that the UCC applies, while Defendants contend that the common law applies to the transaction between the David Hunter and Tri-State. (Pls.' Second Mot. at 18; Defs.' Resp. in Opp'n at 15, ECF No. 217.)  That distinction is important because of the different parol evidence and warranty-disclaimer rules applicable in UCC transactions as opposed to common law transactions.

Article 2 of the Uniform Commercial Code applies to transactions for the sale of goods and is codified at Ohio Revised Code § 1302.01, *et seq.*  When a contract involves the sale of both goods and services—as is the case here—the UCC applies if the transaction is primarily for the sale of goods, "with labor incidentally involved[,]" while the common law applies if the rendition of service is the predominate purpose of the contract.  *Allied Erecting & Dismantling Co. v. Ohio Edison Co.*, 34 N.E.3d 182, 185 (Ohio Ct. App. 2015) (citing *Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.*, 405 N.E.2d 307 (Ohio Ct. App. 1977)).  In applying this test, a "court must consider whether the purchaser's ultimate goal is to obtain a product or a service."  *Id.* at 186.

Disputed facts regarding the "predominate purpose" of the contract are for the jury to resolve, but the determination of whether the UCC or common law applies is a matter of law for the court to decide. *Id.* at 185 (citing *RPC Elec., Inc. v. Wintronics, Inc.*, 2012 WL 986484, ¶ 16 (Ohio Ct. App. 2012)).

At least one Ohio appellate court has held that the UCC applies to a contract to paint a home. *Evilsizor v. Becraft & Sons Gen. Contractors, Ltd.*, 806 N.E.2d 614, 617 (Ohio Ct. App. 2004). In that case, the plaintiff contracted with the defendant, a general contractor, for the defendant to furnish and apply Sherwin-Williams paint to the plaintiff's home. *Id.* at 615–16. The contract included a one-year workmanship warranty and a 20-year product warranty for the Sherwin-Williams paint. *Id.* at 616. In applying the "predominate purpose" test to determine whether the UCC or common law controlled the transaction, the court held that the UCC applied because the selection of paint was "as significant" to the plaintiff's decision to enter into the transaction as the fact that the defendant also applied the paint as a service. *Id.* at 617.

*Evilsizor* is on point, and its reasoning is even more convincing applied here. In that case, the selection of the Sherwin-Williams paint was *as significant* to the consumer as the service of painting of the home; in this case, the type of paint was *more significant* to David Hunter than the service provided. There is no genuine dispute that David Hunter entered into the contract with Tri-State predominantly because of the advertised quality of the Rhino Shield product and the 25-year product warranty offered by the Rhino Shield manufacturer. (David Hunter Dep. 17:17–18:23.) Hunter's "ultimate goal [was] to obtain" the Rhino Shield product. *Allied Erecting & Dismantling*, 34 N.E.3d at 185. Thus, because the goods aspect of the transaction (the Rhino Shield) predominates over the service aspect of the transaction (the application of Rhino Shield to the Hunters' home), the UCC applies.

**b. Application of the UCC to Tri-State's warranty disclaimers**

The Hunters argue that representations made by Defendants outside of the contract amount to express warranties, and that Defendants breached those warranties. (Pls.' Second Mot. at 15–19.) For example, the Hunters focus on the "Rhino Shield" business card Pallone gave to David Hunter, which states in part, "Hassle-Free, no maintenance, won't peel, chip or crack!" (ECF No. 71-5.) The Hunters also argue that Defendants breached the implied warranties of merchantability and fitness for a particular purpose. (Pls.' Second Mot. at 17–20.) Defendants respond that Tri-State only provided two warranties to the Hunters. (Defs.' Resp. in Opp'n at 13.)

Two provisions of Ohio's codification of the UCC are fatal to the Hunters' claims. The first is the UCC parol evidence rule. Ohio Rev. Code § 1302.05. That rule states: "Terms . . . which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . ." *Id.*

Here, the written agreement between David Hunter and Tri-State contains an integration and modification clause, which states:

> "It is understood and agreed that all prior understanding and agreement between the parties are merged in the Agreement, and that Agreement alone fully and completely constitutes the Final Agreement. Any subsequent changes or modifications hereto shall not be binding on either party unless in writing and signed by both parties hereto."

(David Hunter Dep., Ex. C.) Furthermore, the agreement states that "Tri-State Coating is not liable or bound by any warranties, guarantees, statement, or representations made by any broker, agent, employee, or other person representing or proposing to represent to Tri-State Coating unless expressly set forth in the Agreement." (*Id.*) The merger clause together with the modification

31

clause is strong evidence that the parties intended the written contract to be the "final expression of their agreement[.]" Ohio Rev. Code § 1302.05; *see, e.g.*, *Keel v. Toledo Harley-Davidson/Buell*, 920 N.E.2d 1041, 1044 (Ohio Ct. App. 2009) ("The inclusion of the merger clause indicates that the writing is fully integrated and it supersedes any previous agreements or understandings between the parties").

Applying the UCC parol evidence rule, because the written agreement was the final expression of the parties' agreement, the Court may not consider the Hunters' extrinsic evidence of express warranties made outside the written agreement. Those statements contradict the written agreement's expression that "Tri-State Coating is not liable or bound by any warranties . . . unless expressly set forth in the Agreement." (David Hunter Dep., Ex C.)

The second provision fatal to the Hunters' claim is the UCC provision on the exclusion or modification of warranties. *Id.* § 1302.29. That provision specifies that:

> "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that 'There are no warranties which extend beyond the description on the face hereof.'"

*Id.* Tri-State validly disclaimed the implied warranties of merchantability and fitness for a particular purpose under § 1302.29. The written agreement here states:

> "Tri-State Coating makes no warranties express or implied regarding any of the products or services except the express warranties provided herein. TRI -STATE COATING EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES EXCEPT AS PROVIDED HEREIN. WITHOUT LIMITING THE FOREGOING, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE WITH RESPECT TO THE GOODS OR SERVICES SOLD."

(*Id.*) This provision is in writing, conspicuously in all capital letters, and it mentions specifically that Tri-State disclaims the warranty of merchantability and the warranty of fitness for a particular

use.  It therefore complies with Ohio Revised Code § 1302.29 and is a valid disclaimer of implied warranties.  Because Tri-State validly disclaimed the implied warranties of merchantability and fitness for a particular purpose, those warranties were not part of the transaction between David Hunter and Tri-State.  And even if Tri-State's disclaimers did not validly disclaim the implied warranties, the Hunters cannot enforce any warranties implied in the contract between David Hunter and Tri-State because the Hunters cancelled that contract under the HSSA.

In sum, Defendants are entitled to summary judgment on the Hunters' Magnuson-Moss Warranty Act and breach of warranty claims.

## F.  Civil Conspiracy

Defendants move for summary judgment on the Hunters' claims for civil conspiracy. (Defs.' Mot. at 14.)  "The elements of a civil conspiracy claim are: (1) a malicious combination; (2) of two or more persons; (3) causing injury to person or property; and (4) the existence of an unlawful act independent from the actual conspiracy."  *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 326 (S.D. Ohio 2007) (citing *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993) (internal quotations omitted)).

Defendants submit that the Hunters have produced no evidence of a conspiracy or of an unlawful act independent from the conspiracy.  (Defs.' Mot. at 14–15.)  The Hunters respond by levying allegations that Tri-State is Jim Williams's "alter-ego shell entity," and that Defendants "falsified information used in selling the Rhino Shield product[.]" (Pls.' Resp. in Opp'n at 60–61.) The Hunters' speculation is not supported by any evidence in the record, and the Hunters point to no evidence in the record of a conspiracy. *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d at 326.  Speculation "will not suffice to defeat a motion for summary judgment."  *Griffin v. Jones*,

170 F. Supp. 3d 956, 963 (W.D. Ky. 2016). Defendants are therefore entitled to summary judgment on the Hunters' claim for civil conspiracy.

### G. Declaratory Judgment

Defendants next move for summary judgment on the Hunters' claims for declaratory judgment that Defendants are vicariously liable as "Agents, Agents by Estoppel, Apparent Authority, and as a Joint Venture." (Defs.' Mot. at 16.) The Hunters claim that Pallone, "along with Jim Williams, John Robertson, Alex Dgebuadze, Steven Dominique, and others, conduct business for the express intent of making a profit under the guise of an international corporate structure and entity that does not legally exist." (Pls.' Resp. in Opp'n at 62.) They further allege that "none of [Defendants] has ever filed a fictitious name registration in Ohio," that they "fail to identify that Rhino Shield is a fictitious name and entity," and that they all hold themselves out as agents or principles of Rhino Shield "calculated to mislead" consumers. (*Id.* at 63.)

The Hunters cite one case in support of their theory. *Meinert Plumbing v. Warner Industries, Inc.*, 90 N.E.3d 966 (Ohio Ct. App. 2017). That case explains that, "to constitute a joint venture, the parties must express the intent that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure." *Id.* at 977 (citation and internal quotations omitted).

The Hunters' theory that Defendants are part of a joint venture finds no factual support in the record. It is undisputed that Tri-State, an Indiana corporation, lawfully registered to do business under the trade name "Rhino Shield" with the Ohio Secretary of State and is therefore authorized to do business in Ohio under the name "Rhino Shield." *See* Ohio Rev. Code § 1329.01(A)(1) ("Trade name" means a "name used in business or trade to designate the business

of the user and to which the user asserts a right to exclusive use.").  Williams is the president and owner of Tri-State; Rudolph Pallone is an independent contractor working as a salesperson for Tri-State, and Alex Dgebuadze and John Robertson are subcontractors Tri-State hired to apply Rhino Shield.  AmCoat Industries, a Florida corporation owned by Steven Dominique, supplies Rhino Shield to dealers like Tri-State around the country.  As the state court accurately described in 2016:

> "The Agreement [between David Hunter and Tri-State] is titled, "Rhino Shield by Tri-State Coating, Inc." and the name "Tri-State" appears throughout the Agreement.  While Plaintiffs argue that all the defendants loosely conducted business under the name "Rhino Shield" and held themselves out as "Rhino Shield" under the contract, Plaintiffs have provided no evidence that all the defendants are collectively "Rhino Shield."

(Defs.' Ex. 11, ECF No. 189-11; *see also* David Hunter Dep., Ex. C.)

The Hunters' joint-venture theory is purely speculative. There is no evidence that Defendants intended to be "coadventurers, with an equal right of control" over a "Rhino Shield" enterprise. *Meinert Plumbing*, 90 N.E.3d at 977.  Defendants are entitled to summary judgment on the Hunters' declaratory judgment claim.

## H. Alter Ego

Defendants move for summary judgment on the final count of the Hunters' complaint: a claim that the corporate form of Tri-State and AmCoat Technologies should be "disregarded as the alter egos" of Jim Williams, Rudolph Pallone, Alex Dgebuadze, John Robertson, and Steven Dominique, who are "personally liable for the shell companies as their alter egos."  (Defs.' Mot. at 17; Am. Compl.  ¶¶ 245–247, prayer for relief.)

"[I]n certain circumstances the corporate form may be disregarded, and the corporate veil pierced, for the purpose of reaching the assets of the corporation's individual shareholders." *Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 616 (Ohio 2009).  The test in Ohio for whether a court can pierce the corporate veil is whether:

"(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, [an illegal act, or a similarly unlawful act] against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."

*Id.* at 616 n.1 (citation omitted).  Pallone, Dgebuadze, and Robertson are not shareholders or owners of a corporation—veil piercing thus cannot apply to those Defendants.  Furthermore, the Court has granted summary judgment to Williams based on *res judicata*, and the Hunters have not produced evidence against AmCoat Industries or Steven Dominique to support liability on any underlying claims, let alone evidence that veil piercing is appropriate.  The Court grants Defendants' motion for summary judgment on the Hunters' alter ego claim.

### I.  "Rhino Shield" Defendants and AmCoat Technologies, Inc.

Defendants move for summary judgment as to AmCoat Technologies, Inc. on all claims. (Defs.' Mot. at 3.)  Defendant AmCoat Technologies dissolved in 2006, six years before the transaction that is the subject of this lawsuit.  (Articles of Dissolution, Defs.' Ex. 5, ECF No. 189-5.)  The Hunters have produced no evidence connecting AmCoat Technologies, a long-defunct corporation, to this case.  AmCoat Technologies is therefore entitled to summary judgment on all claims.

Defendants also move for summary judgment to the "Rhino Shield" Defendants listed on the docket. (Defs.' Mot. at 7.) There is no genuine factual dispute that "Rhino Shield" is a trade name, not a legal entity.  (Dominique Dep. 16:16–22; Williams Aff. ¶ 3; Certificate of Good Standing, Defs' Ex. 16, ECF No. 217-3.)

Under Ohio law, "[a]n action may be commenced or maintained against the user of a trade name or fictitious name whether or not the name has been registered or reported in compliance with section 1329.01 of the Revised Code."  Ohio Rev. Code § 1329.10.  The statute permits a

plaintiff to maintain suit "against an entity named only by its fictitious name" for the purpose of "encourag[ing] the registration and reporting of fictitious names with the state." *Fam. Med. Found., Inc. v. Bright*, 772 N.E.2d 1177, 1179 (Ohio 2002). The key words in that statute are "the user" of a trade name. Here, as discussed throughout the opinion, "Rhino Shield" is a trade name under which Tri-State is lawfully registered to do business in Ohio. Thus, even though the Hunters may maintain an action against "Rhino Shield," a judgment is only enforceable against "the user"—in this case, Tri-State. And Tri-State is already a Defendant in this action. Because Ohio Revised Code § 1329.10 permits suit to proceed, as a technical matter, against the user of a trade name listed as the trade name, the Court's rulings as to Defendant Tri-State apply the same to Defendant "Rhino Shield" (listed on the docket with the Indiana address) because Tri-State and Rhino Shield (Indiana address) are the same Defendant. Because the Court grants summary judgment to AmCoat Industries on all claims, the Court also grants summary judgment to the Defendants listed on the docket as "Rhino Shield (Florida address)" and "Rhino Shield Florida."

## IV. Motions to Strike

The Hunters have also filed two motions to strike. The first is a motion to strike exhibits in support of Defendants' Motion for Summary Judgment. (First Mot. to Strike, ECF No. 216.) The second is a motion to strike Defendants' Reply in Support of their Motion for Summary Judgment and to strike the exhibits. (Second Mot. to Strike, ECF No. 233.) Neither motion is well-taken.

### A. First Motion to Strike

The Hunters' first motion asks the Court to strike nearly every single exhibit filed with Defendant's Motion for Summary Judgment. (First Mot. to Strike.) The Hunters first take issue with the declarations of Jim Williams (ECF No. 189-1) and Steven Dominique (ECF No. 189-2)

as not being properly sworn under 28 U.S.C. § 1746.  The Court did not rely on those declarations in its decision. And Defendants indicate in their response that the attestations were inadvertently cut off from the bottom of the documents and that they have resubmitted the documents.  (ECF No. 223; Defs.' Response, ECF No. 224.)

The Hunters' motion also challenges the substance of the facts contained in Williams's and Dominique's declarations.  It appears to be another attempt to advance the arguments the Hunters made in their four motions for summary judgment.  The Court did not rely on those declarations anyway, so the Hunters' arguments are moot.  See *Hughes v. Lavender*, No. 2:10-cv-674, 2011 WL 2945843, at *5 (S.D. Ohio July 20, 2011) (citation omitted).

Finally, the Hunters challenge the affidavit of Dave Lackey, the Defendants' counsel in the state court action involving these parties.  (First Mot. to Strike at 20.)  The Court did not rely on the cited affidavit.  The Hunters' arguments are therefore moot.  *See Hughes*, 2011 WL 2945843, at *5.  The Hunters do not make arguments for striking the other exhibits the Hunters moved to strike.  The Hunters' First Motion to Strike is denied.

### B.  Second Motion to Strike

The Hunters' second motion to strike asks the Court to strike Defendants' reply in support of their motion for summary judgment, an affidavit from Defendants' counsel in the state court action, Dave Lackey, an affidavit from Defendant Alex Dgebuadze, and almost all other exhibits filed.  (Second Mot. to Strike, ECF No. 233.)  The Court did not rely on the Dgebuadze affidavit in this opinion.  The Hunters' motion is therefore moot as to Dgebuadze's affidavit.

The Hunters' argue that Defendants' reply brief "impermissibly raises multiple new matters and issues for the first time[.]" (*Id.* at 2.)  Having reviewed Defendants' reply brief (ECF No. 226), the Hunters' argument is simply not true.  The Court declines to strike the reply brief.

Defendants challenge the affidavit of Dave Lackey (ECF No. 226-11), Defendants' counsel in the state court action between these parties. The statements in Lackey's affidavit are relevant to proving Defendant Jim Williams's *res judicata* defense. The statements in the affidavit are based on Lackey's personal knowledge and are not hearsay. (ECF No. 226-11.) The Court declines to strike this exhibit.

Lastly, the Hunters move to strike all exhibits submitted with Defendants' reply. These arguments simply re-argue the substance of the Hunters' claims and are not well-taken. The Hunters' Second Motion to Strike is Denied.

### V. Motion for Default Judgment

Defendant Dgebuadze is in default in this action and the Hunters have moved for default judgment against him on all claims in the Amended Complaint. (ECF No. 196.)

Federal Rule of Civil Procedure 55 "contemplates a two-step process in obtaining a default judgment against a defendant who has failed to plead or otherwise defend." *Columbus Life Ins. Co. v. Walker-Macklin*, No. 1:15-cv-535, 2016 WL 4007092, at *2 (S.D. Ohio July 26, 2016). First, a plaintiff must request an entry of default from the Clerk of Courts. Fed. R. Civ. P. 55(a). Upon the Clerk's entry of default, "the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven." *United States v. Parker-Billingsley*, No. 3:14-cv-307, 2015 WL 4539843, at *1 (S.D. Ohio Feb. 10, 2015) (quoting *Broad, Music, Inc. v. Pub Dayton, LLC*, No. 3:11-cv-58, 2011 WL 2118228, at *2 (S.D. Ohio May 27, 2011)). Second, if the plaintiff's claims are not for "a sum certain or a sum that can be made certain by computation," the plaintiff must then apply to the Court for a default judgment. Fed. R. Civ. P. 55(b). "Thus, while liability may be shown by well-pleaded allegations, the district court

must conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *DT Fashion LLC*, 2018 WL 542268, at *2 (quoting *Parker-Billingsley*, 2015 WL 4539843, at *1).

The Amended Complaint's well-pleaded factual allegations do not establish Dgebuadze's liability on any of the Hunters' claims. The Amended Complaint groups all Defendants together under the theory that Defendants are jointly liable as a Rhino Shield enterprise and that Dgebuadze was part of this enterprise. (*See* Am. Compl. ¶¶ 58, 77, 99, 232.) It does not make sufficient factual allegations specific to Dgebuadze to establish his liability on any of the Hunters' claims. (*See id.*) Furthermore, when "liability is joint[,] . . . a default may be entered against the defaulting party, but entry of a default judgment against such party must await either a default by all of the parties or the outcome of the trial on the merits as to those defendants not in default." Bateman et al., 21A Fed. Proc., L. Ed. § 51:60 (June 2021 update). If the "plaintiff loses on the merits, the complaint should then be dismissed against both the defaulting and the nondefaulting defendants." *Id.* Here, because the Court granted summary judgment in favor of all other Defendants on the Hunters' claims that Defendants are jointly liable as "Rhino Shield," the Hunters cannot obtain an inconsistent default judgment against Defendant Dgebuadze on that theory. The Court denies the Hunters' motion for default judgment. (ECF No. 196.)

### VI. Conclusion

For the foregoing reasons:

(1) Defendants' Motion for Summary Judgment is **GRANTED**. (ECF No. 189.)

(2) Plaintiffs' First Motion for Summary Judgment is **DENIED**. (ECF No. 190.)

(3) Plaintiffs' Second Motion for Summary Judgment is **DENIED**. (ECF No. 191.)

(4) Plaintiffs' Third Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. (ECF No. 192.)

(5) Plaintiffs' Fourth Motion for Summary Judgment is **DENIED**.  (ECF No. 193.)

(6) Plaintiffs' First Motion to Strike is **DENIED**.  (ECF No. 216.)

(7) Plaintiffs' Second Motion to Strike is **DENIED**.  (ECF No. 233.)

(8) Plaintiffs' Motion for Default Judgment against Alex Dgebuadze is **DENIED**.  (ECF No. 196.)

The Clerk is **DIRECTED** to **ENTER JUDGMENT** as follows:

(1) Judgment is entered in favor of Plaintiff Mark Hunter, Executor of the Estate of David G. Hunter, against Defendant Tri-State Coating, Inc. as to Defendant Tri-State Coating, Inc.'s liability for failure to provide a three-day cancellation notice as required under Ohio Revised Code § 1345.23(A) and (B).  Pursuant to Plaintiff Hunter's cancellation of the contract under Ohio Revised Code § 1345.23(C), Defendant Tri-State Coating, Inc. shall immediately refund to Plaintiff Mark Hunter all payments David Hunter made under the contract between David Hunter and Tri-State.

(2) Judgment is entered in favor of all Defendants on all other claims.

This case is closed.

**IT IS SO ORDERED.**

**7/19/2021**                                        **s/Edmund A. Sargus, Jr.**
**DATE**                                               **EDMUND A. SARGUS, JR.**
                                                          **UNITED STATES DISTRICT JUDGE**